2220

ORANGEBURG SAUSAGE COMPANY, Respondent v. CINCINNATI INSURANCE COMPANY and R.L. Bryant & Son, Appellants.

(450 S.E. (2d) 66)

Court of Appeals

*William O. Sweeny, III,* of *Sweeny, Wingate, Murphy & Barrow;* and *I.S. Leevy Johnson* of *Johnson, Toal & Battiste,* Columbia, *for appellant Cincinnati Ins. Co.; Paul A. Dominick* and *Jay S. Masty,* both of *Nexsen, Pruet, Jacobs, Pollard & Robinson,* Charleston, *for appellant R.L. Bryant & Son.*

*Kenneth M. Suggs* of *Suggs & Kelly,* Columbia, *for respondent.*

Heard Oct. 4, 1993.

Decided Sept. 6, 1994; Reh. Den. Nov. 9, 1994.

HOWELL, Chief Justice:

Orangeburg Sausage Company (OSCO) sued Cincinnati Insurance Company (Cincinnati) for breach of contract, negligence,[1] and bad-faith failure to pay insurance benefits following a claim for damages to OSCO's business resulting from Hurricane Hugo. OSCO also sued the insurance agent, R.L. Bryant & Son, Inc. (Bryant), for negligence in connection with the policy and claim. A jury awarded OSCO $800,000 actual damages on the negligence claim against both defendants, $254,029.73 against Cincinnati on the breach of contract claim, and $250,000 against Cincinnati on the bad-faith claim. The jury responded to a special interrogatory and found the defendants acted recklessly, wilfully, wantonly, or in conscious disregard for OSCO's rights.

The trial court required OSCO to elect its remedy, and OSCO chose to recover under its negligence theory. By agreement the court then held a separate hearing on punitive damages. The jury returned a verdict for OSCO for $1,630,000 in punitive damages.

Cincinnati and Bryant moved for judgment notwithstanding the verdict, new trial absolute, or alternatively new trial *nisi remittitur*. In a thorough and detailed order, the trial court granted the new trial *nisi remittitur* motion, reducing the actual damages verdict to $595,216.00. The trial court denied all other motions, and Cincinnati and Bryant appeal. We affirm.

OSCO is a corporation engaged in the wholesale and retail sale of food products. OSCO's business complex surrounds the end of a dead-end street. The freezer building is on the opposite side. Evidence showed that the entire business location has always been known as 597 High Street.

Cincinnati provided insurance on the contents of OSCO's freezers. Cincinnati wrote an initial policy covering the frozen foods products beginning July 1, 1983 and ending July 1, 1988. This policy listed "597 High Street" as the location of the insured premises. OSCO had requested coverage of $200,000.00

---

[1] *See Sullivan Co., Inc. v. New Swirl, Inc.,* — S.C. —, 437 S.E. (2d) 30 (1993) (an insurance agent or broker must exercise good faith, reasonable skill, care, and diligence; if, because of his fault or neglect, the agent fails to procure insurance, or does not follow instructions, or the policy issued is void, or materially deficient, or does not provide the coverage he undertook to supply, the agent is liable to his principal).

for the frozen food products alone, though Cincinnati wrote the policy to cover all contents.

In October 1986, three years into the initial policy, OSCO pledged its real estate and equipment located on High Street as collateral for a loan. The loan required that the collateral be covered by casualty insurance, so OSCO asked Bryant to add the necessary coverage. Bryant sent a memo to Cincinnati requesting an endorsement for the additional coverage. There was no evidence that an OSCO representative had ever seen this document before this lawsuit. This memo, for the first time, uses the erroneous "488 High Street" as a premises address, in addition to a reference to "597." Cincinnati issued an insurance binder adding coverage of $75,000.00 for each building and $30,000.00 for the "contents—equipment" located in each.[2] The binder describes one building as 597 High Street and the other as "across street from 597." The evidence was undisputed that there is no "488 High Street" and that the freezer building would not have that designation if assigned one by the Post Office. The trial court noted that the only credible evidence was that 488 first appeared on a form which the agent prepared, without the insured's signature or review.

About two years later, when the initial policy expired in 1988, Cincinnati issued a one-year policy. OSCO's witnesses classified this as a renewal. OSCO sought no changes in coverage between the 1986 loan and September 1989. The application for the renewal policy used both the 597 High Street and 488 High Street addresses, but was not signed by OSCO's representatives despite a blank for its signature.

OSCO's representatives said they did not read this policy, though Bryant's witness testified that a representative of Bryant delivered it and went over it with OSCO's vice president when it was received. Two experts testified that people generally do not read their insurance contracts and, if they do read them, they do not generally understand them. The insurance company drew this contract and chose its language.

The third page inside the cover of the 1988 policy is entitled "Common Policy Declarations." OSCO is the insured and the

---

[2] In evaluating this request for additional coverage, the frozen food products in the freezer building were the only contents which OSCO had previously sought to insure and those products had been insured for the preceding three years at an address of 597 High Street.

address is "597 High Street." The eighth page of the policy is entitled "Commercial Property Coverage Part Declarations" and is the only page which refers to a "488 High Street" address. On that page, item numbers are separately stated for the locations and the coverage, but there is no explanation of the significance of the numbering system. The record contains a "Dealers Comprehensive Form," along with evidence that Cincinnati considered it included in the 1988 contract. This document can be read as providing coverage for products of the insured on property located *anywhere,* provided that the property was owned, leased, or regularly used by the insured in its business.

In September 1989, Hurricane Hugo damaged OSCO's property. An off-premises power outage cut OSCO's electricity, and wind damaged OSCO's plant, allowing rainwater to contaminate the frozen food products stored in separate units of the freezer building. Cincinnati adjusted the loss at more than $250,000.00, but disputed OSCO's claim for insurance benefits. After a delay of eight months, Cincinnati paid only slightly over $36,000.00, asserting first that OSCO had changed its position on the cause of loss after learning that the initial claim (off-premises power outage) was not covered, and second, that the largest amount of contents coverage was not for the freezer building.

When the claim was not paid, OSCO promptly hired an attorney. On November 14, 1989, the attorney forwarded to Cincinnati an itemization of losses totalling $231,505.12, including $198,260.13 for contaminated frozen food in the main freezer. The attorney also made a demand for the undisputed portions of the coverage.

Several Cincinnati adjusters were involved in the claim. OSCO provided affidavits and other materials, and Jim Guth, a Cincinnati adjuster, reviewed the claim and inspected the property. Guth's report indicated Cincinnati determined OSCO's claim to be valid and covered. Guth raised the reserves on the contents as of December 5, 1989, to $210,000.00 Dollars. On December 8, 1989, OSCO sent Guth information, along with another demand for prompt payment of the undisputed amounts. Shortly thereafter, Guth's involvement with the file was ended and yet another adjuster, Hendrickson, became involved.

OSCO supplied (or resupplied) more information on January 17, 1990. Despite Guth's findings and actions in raising the reserves, Cincinnati informed OSCO that the contents coverage for the freezer building was limited to $30,000.00. On February 20, 1990, five months and four adjusters after the hurricane, Cincinnati sent OSCO an itemization of what it would pay, reflecting the lower coverage level and imposing a coinsurance penalty.

Cincinnati claimed the only plausible reading of the 1988 policy is that the freezer building is 488 (even though the evidence shows that Cincinnati insured it as 597 for the preceding five years) and that the contents there are insured for only $30,000.00, while the building on the opposite side of the street had $230,000.00 coverage for contents (even though there was competent evidence that the risk of loss was far greater for the freezer building). Cincinnati asserted that if OSCO's representatives had only looked at the 1988 policy, they would clearly have seen that the coverages were switched from what they should have been.

On March 6, 1990, OSCO's attorney requested, for at least the *fifth* time, that Cincinnati pay the undisputed portions of the claim. Five and one-half months after the hurricane, the request for payment of the undisputed amounts was sent to the home office and, about two weeks thereafter, the adjuster was instructed to pay the undisputed portions of the claim and to set up a meeting to try to resolve the disputed portions. Two more months passed. When the meeting was held in May 1990, Cincinnati tendered payment for the undisputed portion of the claim conditioned upon OSCO's signing a receipt referring to losses at 597 *and 488* High Street. The non-existence of 488, however, was in dispute. Upon OSCO's refusal to sign, Cincinnati withdrew payment of the check for $41,319.93. On May 23, 1990, Cincinnati deducted approximately $5,000.00 for some reason and sent OSCO a check for $36,006.89 for the undisputed amount. Thus, eight months passed between the hurricane loss and Cincinnati's payment of $36,006.89 towards a loss which Cincinnati adjusted at $254,029.23. In fact, on February 2, 1990, Cincinnati had offered to pay a total of $75,675.51. Two years passed before the case went to trial.

## I.

Cincinnati and Bryant argue the trial court erred in failing to grant its directed verdict motion on the ground that OSCO was contributorily negligent as a matter of law for failing to read its policy. Cincinnati and Bryant argue OSCO's principals' failure to read the policy precludes them from complaining about the coverage provided by the policy, under *Doub v. Weathersby-Breeland Insurance Agency*, 268 S.C. 319, 233 S.E. (2d) 111 (1977). We disagree.

In *Doub*, the plaintiff sought coverage for damage to his roof caused by a snow and ice storm. Damage caused by snow or ice was specifically excluded from coverage under the policy. The plaintiff conceded the exclusion in the case was valid and brought an action for fraud and misrepresentation against the insurer. The plaintiff admitted that he never read the policy, but stated that if he had he would not have understood the scope of the exclusion. The insurer moved for a directed verdict on two grounds: (1) plaintiff had no right to rely on oral misrepresentation as to the coverage when the written terms were in his possession and available to him; and (2) there was no evidence of a detrimental change of position in reliance on those misrepresentations. The Supreme Court noted:

> [O]ne cannot complain of fraud in the misrepresentation of the contents of a written instrument in his possession when the truth could have been ascertained by his reading the instrument. One entering into a contract should read it and avail himself of every reasonable opportunity to understand its contents and meaning.

233 S.E. (2d) at 114. The Court noted further:

> * * * Here, plaintiff had eighteen months to inform himself as to the terms, conditions and exclusions in the written contract to which he was a party. He made no effort to do so, and never read the contract. The facts here are entirely different and distinguishable from those in *Riddle-Duckworth, Inc. v. Sullivan*, 253 S.C. 411, 171 S.E. (2d) 486 (1969), where the insured had read the policy contract, had not understood the coverage on certain items, including the elevator, and had specifically asked if the operation of the elevator was covered, to which the

defendant agent, an experienced insurance agent, had replied that it was. Here, plaintiff never read his policy and made no inquiries as to any of its specific terms and provisions, and continued to ignore the written instrument for eighteen months.

*Id. Doub,* however, does not compel a finding of contributory negligence in the case at bar. In *Doub,* the conduct of the plaintiff was clearly a proximate cause of his injury. The policy explicitly and unambiguously excluded coverage for damage caused by snow and ice. Had the plaintiff read his policy, he would have immediately recognized the gap in his coverage, and could have purchased additional insurance.[3] Here, there was ample evidence that OSCO's employees might not have learned and understood the relevant terms and provisions of the policy by simply reading it. The policies provided by Cincinnati were inconsistent and confusing. In fact, Cincinnati's own adjuster gave the policy the same interpretation as that asserted by OSCO at trial. The contents of the freezer building were originally insured for $200,000 under a policy covering property located at 597 High Street. The 1988 policy provided $230,000 of coverage for the contents of a building located at 597 High Street. While the 1988 policy also used the 488 High Street address, it did not describe the building at this address as the freezer building. Thus, even if OSCO had read the policy, it would not have been put on notice that the policy did not provide the coverage it had requested. Therefore, even if OSCO were contributorily negligent, there is no evidence that this negligence was a proximate cause of the loss. *See, e.g., Edwards v. Bloom,* 246 S.C. 346, 143 S.E. (2d) 614 (1956) (to bar recovery, negligence of injured party must have contributed as a proximate cause of the injury); *accord Gruber v. Santee Frozen Foods, Inc.,* 309 S.C. 13, 419 S.E. (2d) 795 (Ct. App. 1992), *cert. denied* (1993).

Moreover, OSCO relied upon the agent whom they trusted to provide them with the same coverage they enjoyed for the previous five years under the policy. *See Riddle-Duckworth,*

---

[3] The court found the exclusion in *Doub* to be unambiguous, and not difficult to understand. The court therefore described plaintiff's assertion that he would not have understood the exclusion as "hardly credible." 233 S.E. (2d) at 113.

*Inc. v. Sullivan*, 253 S.C. 411, 423-24, 171 S.E. (2d) 486, 492 (1969) ("[w]hile an insured cannot abandon all care, the rules which require one to inform himself of the terms of his contract and to take precautions for his own protection are less exacting when dealing with one's own insurance agent or broker in the procurement of an insurance contract"). After the 1983 policy was put in place, OSCO requested additional coverage, but never requested that the coverage level on the freezer building be reduced. OSCO was entitled to rely on Bryant to properly renew the insurance policy. A review of the policy by a layman would not have revealed the coverage problem.

Questions of contributory negligence and recklessness are ordinarily for the jury and only rarely become questions of law for the court. *See Tucker v. Albert Rice Furniture Sales, Inc.*, 295 S.C. 119, 367 S.E. (2d) 427 (Ct. App. 1988) (where there is any uncertainty as to the existence of contributory negligence, the question of whether a plaintiff is guilty of contributory negligence which will bar recovery is for the jury to determine). The question of contributory negligence becomes a question of law for the courts only when the evidence is susceptible of but a single reasonable inference. *Id.* Further, even if undisputed facts show that both parties may be guilty of negligence, "questions of negligence, proximate cause, and contributory negligence should be submitted to the jury if there is a fair difference of opinion as to whose act or acts produced or contributed to the injury complained of as a direct and proximate cause." *Republic Textile Equip. Co. of S.C. v. Aetna Ins. Co.*, 293 S.C. 381, 388, 360 S.E. (2d) 540, 544 (Ct. App. 1987). In determining whether a plaintiff is contributorily negligent as a matter of law, the evidence of the whole case must be viewed in the light most favorable to the party opposing the motion for directed verdict. *Tucker*, 367 S.E. (2d) at 429. Viewing the evidence in the light most favorable to OSCO, we conclude the trial court properly submitted the issue of contributory negligence to the jury.

Furthermore, the trial court held that even if the court could hold OSCO contributorily negligent as a matter of law in failing to read the insurance policy, the jury affirmatively found, with ample supporting evidence, that the defendants were wilful, wanton and reckless. We agree. Con-

tributory negligence is not a defense to reckless and wilful conduct. *Ballou v. Sigma Nu General Fraternity*, 291 S.C. 140, 352 S.E. (2d) 488 (Ct. App. 1986). Although Cincinnati argues the issue of contributorily recklessness in its brief on appeal, the trial court refused to address it because the court held Cincinnati did not raise the issue at trial. In fact, the trial court charged the jury "[i]f you find that the defendant was reckless, willful, or wanton and that the plaintiff was merely negligent, then your verdict must be for the plaintiff unless the defendant proves the next step, and that is that the plaintiff was contributorily reckless, willful, or wanton." Hence, the court submitted the issue of OSCO's contributory recklessness to the jury, which found in OSCO's favor.

## II.

Cincinnati argues the trial court erred in failing to grant its motion for directed verdict as to punitive damages. We disagree.

The trial court conducted a separate hearing on the issue of punitive damages. OSCO called an expert witness who testified about Cincinnati's net worth, its reserves, and its earnings. Cincinnati offered no witnesses and asked only one question on cross-examination. The entire punitive damages hearing lasted only minutes, though the trial court in no way restricted the parties. The parties also agreed that they would not make closing arguments in this stage of the trial, again not at the trial court's insistence. After deliberations, the jury found OSCO showed by clear and convincing evidence its entitlement to an award of punitive damages. The jury awarded $1,630,000.00 in punitive damages, which was roughly twice the actual damages award, and 0.003 percent of Cincinnati's net worth.

The trial court conducted a posttrial review pursuant to *Gamble v. Stevenson*, 305 S.C. 104, 406 S.E. (2d) 350 (1991), and made findings on the record. The trial court also considered additional materials which were supplied by Cincinnati. Cincinnati filed various motions to vacate the award of punitive damages, for a new trial, and for post-verdict review of the punitive damages award. The trial court reviewed these motions in light of the requirements of *Gamble* and *Pacific Mutual Life Insurance Company v. Haslip*, 499 U.S. 1, 111

S.Ct. 1032, 113 L.Ed. (2d) 1 (1991), and reaffirmed its previous determination that the award of punitive damages in this instance was proper.

The trial court noted the United States Supreme Court and Supreme Court of South Carolina have found that punitive damages do not violate the Due Process clause, so long as the system for their imposition is accompanied by sufficient safeguards. The trial court also noted that South Carolina's commitment to the imposition of punitive damages in appropriate circumstances has been reaffirmed as a matter of public policy. The court found the record contained clear and convincing evidence that Cincinnati engaged in a wide variety of misconduct in issuing the policy and adjusting the claim justifying the award of punitive damages in the amount determined by the jury. The court held there was clear and convincing evidence that Cincinnati acted recklessly or in conscious disregard of OSCO's rights by: disregarding substantial evidence that OSCO's loss was from water damage, rather than an off-premises power outage; refusing to pay, without explanation, even the undisputed portions of OSCO's claims for eight months, despite repeated requests for payment; violating portions of its own claims manual; demanding documentation on a piecemeal basis for months after the loss; taking five months to advance the position that the freezer building had only $30,000 in contents coverage and did so *after* one of its adjusters determined that the loss was owed and increased the reserves; refusing to consider OSCO's very viable position on the issue of the incorrect address and Cincinnati's responsibilities, despite having insured OSCO's freezer building at a listed address of 597 High Street for the preceding five years; and requiring, as a condition of payment of the undisputed portions of OSCO's claim, a concession on a major dispute concerning the address.

The trial court also found there was clear and convincing evidence that Cincinnati was fully aware of the conduct of its agents, as one of its officers testified that he personally supervised the claim. The court found the punitive damages award was well within proportions to the original actual award and the amount to which the court reduced the actual award, noting that the award in *Haslip* was more than 200 times the plaintiff's out of pocket expenses. The court found the award

easily within Cincinnati's ability to pay as it is only three/one-thousandths of Cincinnati's net worth. The court also found the deterrent effect of the punitive award obvious, as the amount is substantial, designed to get the attention of Cincinnati without being excessive, and appropriate to effect the implementation of remedial action. The trial court noted in Cincinnati's written argument in support of its motion to vacate, Cincinnati stated it fired its agent, added new policy language, and took other, unspecified remedial steps, which demonstrates the punitive award achieved its purpose. Accordingly, the trial court confirmed the award.

After carefully reviewing the record, we agree with the trial court's analysis. A punitive damages award survives constitutional scrutiny if: (1) the trial court's jury instruction explains the nature, purpose and basis for the award; (2) posttrial procedures enable the court to scrutinize the award; and (3) an appellate review process ensures that the award is reasonable and rational. *Kinard v. Crosby,* — S.C. —, 433 S.E. (2d) 835, 839 (1993). The trial court's charge in this case explained the nature, purpose and basis for the award, in compliance with *Gamble.* Further, the court reviewed both the actual and punitive damages awards and found them to be within reasonable limits. *See Weir v. Citicorp Nat. Serv., Inc.,* — S.C. —, 435 S.E. (2d) 864 (1993) (under *Gamble v. Stevenson,* the trial judge may consider enumerated factors, but is not required to make findings of fact for each factor; after carefully reviewing the record, the Supreme Court found no error in the trial judge's review of the punitive damages award). Accordingly, we affirm the punitive damage award. *Kinard,* 433 S.E. (2d) at 839.

Cincinnati also complains that the trial court should not have included in the charge on punitive damages those factors cited in *Gamble* which appeared to be factually applicable to this case. Those factors, according to Cincinnati, are only for a posttrial evaluation by the court. The trial court held that while *Gamble* did list the factors in the context of review of the jury's award by the trial court, there appears to be no logical reason to assert they should not be considered by the jury. The court noted the Fourth Circuit Court of Appeals has held that federal trial courts must submit the *Gamble* factors to the jury, finding that the standards adopted by the

South Carolina Supreme Court in *Gamble* are intended to be the basis for all awards of punitive damages in South Carolina. *Mattison v. Dallas Carrier Corp.*, 947 F. (2d) 95, 109-10 (4th Cir. 1991). We find no error in the trial court's instruction and hold that it complies with the requirement in *Kinard* that the trial court explain the nature, purpose and basis for the award to the jury.

■ Cincinnati also contends that the trial court should have declared a mistrial during the punitive damages phase, arguing that OSCO made improper arguments regarding the unusual length of the trial and that the testimony concerning Cincinnati's daily earnings was prejudicial and improperly suggested a formula for determining the amount of punitive damages. The court stated that Cincinnati raised only the question of an improper formula at trial, and accordingly only addressed that issue.

Dr. Oliver Wood, OSCO's financial expert, testified that Cincinnati's daily earnings were approximately $290,000.00 per day and that it had therefore earned $2.9 million during the ten days of trial. The trial court found this testimony clearly relevant on the issue of Cincinnati's ability to pay an award. *See Mattison v. Dallas Carrier Corp.* and *Gamble v. Stevenson.* Further, the trial court perceived no prejudice from the daily earnings testimony as the award of punitive damages was far less than $2.9 million. We find no abuse of discretion.[4]

### III.

■ Cincinnati argues the trial court erred in failing to grant its motion for a new trial based upon the inconsistency of the jury's verdicts, since the jury returned widely varying amounts under the separate causes of action. We disagree.

It is the duty of the court to sustain a verdict when a logical reason for reconciling the verdict can be found. *Rhodes v. Winn-Dixie Greenville, Inc.*, 249 S.C. 526, 155 S.E. (2d) 308 (1967); *Haskins v. Fairfield Elec. Co-op.*, 283 S.C. 229, 321

---

[4] We note the second part of the bifurcated hearing lasted only a few minutes. OSCO's counsel presented only one witness, Dr. Wood, and asked him thirteen questions. Cincinnati's counsel asked the witness only one question on cross-examination, and presented nothing in reply.

S.E. (2d) 185 (Ct. App. 1984), *overruled in part other grounds,* *O'Neal v. Bowles,* — S.C. —, 431 S.E. (2d) 555 (1993). *See also* *New York Carpet world v. Houston,* 292 S.C. 101, 354 S.E. (2d) 924 (Ct. App. 1987) (a jury's verdict should be affirmed if it is possible to do so and carry into effect the jury's clear intention; it is the Court of Appeals's duty to uphold jury verdicts if they can be logically reconciled).

In this case, the jury found for OSCO on is negligence, breach of contract, and bad-faith claims. Although the jury awarded different amounts under each theory, this does not mean the verdicts are inconsistent. Different damages are recoverable under each claim, and the trial court instructed the jury as to the appropriate measure of damages under each claim. In fact, in response to counsel's argument regarding exceptions to the charge, the court brought the jury back and specifically instructed the jury regarding the different measures of damage under each of OSCO's claims. We find no error.

## IV.

Cincinnati argues the trial court erred in failing to grant its motion for new trial as to actual damages, claiming the awards were unduly liberal, excessive, and motivated by passion, caprice and prejudice. We disagree.

Dr. Wood, an expert on evaluating business losses, testified that OSCO had suffered a loss of $595,216.00 up to the time of trial, due to a combination of unpaid property loss claims and loss of profit due to inability to sell, replace, and resell inventory. Tim Lee, OSCO's president, testified without elaboration that his business had suffered a loss of $750,000.00.

The trial court noted that while the jury could, and obviously did, believe Lee's testimony regarding damages, there was little, if anything, to substantiate the amount. The court determined that the actual damage award should be reduced to the amount established by Dr. Wood's expert opinion. The trial court specifically held this did not mean the verdict was the result of caprice, passion or prejudice, not that it should be set aside entirely. *See, e.g., Hall v. Palmetto Enter. II, Inc.,* 282 S.C. 87, 317 S.E. (2d) 140 (Ct. App. 1984).

A motion for new trial *nisi remittitur* asks the trial court in its discretion to reduce the verdict because it is "merely ex-

cessive," although not motivated by considerations such as passion, caprice or prejudice. *O'Neal v. Bowles,* — S.C. —, 431 S.E. (2d) 555 (1993). The grant or denial of this motion is within the trial court's discretion and its decision will not be reversed on appeal absent an abuse of discretion. *Id.* We have reviewed the record and do not find an abuse of discretion. Further, we do not find the amount of the verdict grossly excessive so as to be the result of passion, caprice, prejudice, or some other influence outside the evidence, so to require a new trial absolute. *Id.*

Cincinnati also alleged the jury was motivated by improper argument on the part of OSCO's counsel. The trial court noted it recalled no impropriety which would taint the trial, and that Cincinnati made no objection at trial. We agree with the trial court that Cincinnati accordingly waived any right to question the propriety of the argument. *Johnson v. Painter,* 279 S.C. 390, 307 S.E. (2d) 860 (1983).

### V.

Cincinnati argues the trial court erred in permitting expert testimony regarding the propensities of insureds to fail to read their policies, claiming the testimony contradicted the law of South Carolina that "failure to read a policy is contributory negligence/recklessness as a matter of law." Cincinnati claims an expert may not give an opinion on questions of law, nor can an expert instruct the court with respect to the law applicable to the case.

In its posttrial order, the trial court noted that the expert, Mike Barranco, commented briefly that most insureds do not read their insurance policies. The court also noted that Cincinnati contended this testimony was unduly prejudicial and "contradicted the clear law of South Carolina." The trial court held in the context in which it was given, Cincinnati suffered no prejudice from this remark, and its admission was not an abuse of discretion. The court also held the testimony was appropriate, citing *Shields v. South Carolina Dept. of Highways and Pub. Transp.,* 303 S.C. 439, 401 S.E. (2d) 185 (Ct. App. 1991), *cert. denied* (trial court admitted expert testimony that the Department's actions "bordered on criminal negligence"; the Court of Appeals disagreed that the expert commented "on what the law is" but actually only gave his opinion on an

issue of fact in the case).

We have reviewed the record and arguments of counsel and find no abuse of discretion. *See Hofer v. St. Clair,* 298 S.C. 503, 381 S.E. (2d) 736 (1989) (the admission or exclusion of evidence is within the trial court's discretion).

## VI.

Cincinnati argues the trial court improperly permitted attorney Ladson Beach to testify. Cincinnati claims that Beach was named as a witness in an untimely fashion, that Cincinnati was deprived of its right to fully depose Beach, and that Beach's testimony violated Rule 3.7 of the Rules of Professional Conduct (found in Rule 407, SCACR) in that his roles as advocate and witness unduly prejudiced Cincinnati.

Beach was the attorney OSCO initially hired when problems arose in its claim. The trial court found Beach "clearly played an integral and well-known part in the process which gave rise to this lawsuit." Cincinnati raised the issue concerning Beach's possible testimony at the outset of the trial and the trial court reviewed the matter overnight. The court determined that Beach was entitled to be present as he was OSCO's attorney, but that the ethics rules prohibited an attorney-witness from continuing as an "advocate" in the trial. OSCO's counsel told the court and opposing counsel at the outset that Beach might be called, but only in rebuttal, for the purpose of contradicting words and actions attributed to him by an agent of Cincinnati. OSCO listed Beach as a potential witness the week before trial and his deposition was begun, though not completed. When the issue regarding Beach's testimony arose, the trial court offered Cincinnati the opportunity to request a continuance. Counsel declined to do so. The trial court held the Rules of Civil Procedure do not establish a cutoff for naming of witnesses and found nothing improper in allowing Beach to testify in reply. *McGaha v. Mosley,* 283 S.C. 268, 322 S.E. (2d) 461 (Ct. App. 1984).

The trial court added that under Rule 3.7 of the Rules of Professional Conduct, even if Beach acted as an advocate during the trial, subsection (3) allowed testimony where "[d]isqualification of the lawyer would work a substantial hardship on the client." The trial court found that disqualifica-

tion of Beach would have deprived OSCO of the only available witness to rebut the adjuster's testimony, which would be a substantial hardship to OSCO. The court determined it properly admitted Beach's testimony and there was no surprise to Cincinnati.

We have reviewed the record and arguments on appeal and find no abuse of discretion in the trial court's ruling.

## VII.

Cincinnati argues the trial court erred in failing to instruct the jury that it could consider alleged recklessness, willfulness and wantonness of Cincinnati only as it related to alleged negligent procurement conduct by Bryant when determining punitive damages. It appears, however, that this issue was not properly preserved for appeal. Cincinnati raised the issue with the trial court before the jury was charged on punitive damages. After much discussion, the trial court took the issue under advisement without making a ruling. The jury charge given did not exclude the bad-faith evidence from the jury's consideration. While Cincinnati raised many other objections after the charge was given, it did not raise this particular objection again. Cincinnati's failure to request a ruling by the court and its failure to raise this particular objection to the punitive damages charge after the charge was given leaves th issue unpreserved for review. *See, e.g.,* *Haskins*, 283 S.C. at 238, 321 S.E. (2d) at 191 (where trial judge does not make ruling and counsel does not pursue ruling, issue is not preserved for appeal); *Gruber*, 309 S.C. at 21, 419 S.E. (2d) at 795 (failure to object to improper jury instruction leaves issue unpreserved for appeal).

However, even if the issue were preserved, we find no error. Cincinnati contends that, because OSCO elected to recover under its negligence cause of action, the jury should have considered only the evidence supporting the negligence claim during the punitive damages phase of the trial. We disagree.

Election of remedies is required to prevent double recovery for a single wrong. *Inman v. Imperial Chrysler-Plymouth, Inc.*, 303 S.C. 10, 397 S.E. (2d) 774 (Ct. App. 1990). OSCO suffered a single wrong and asserted several theories under which Cincinnati could be held liable. OSCO, of course, could

not recover for both negligence and breach of contract and therefore elected to recover only on its tort claim. The jury specifically found Cincinnati acted willfully or recklessly in connection with OSCO's negligence claim and its bad-faith claim. Punitive damages were thus appropriate under the negligence cause of action as well as the bad-faith cause of action. OSCO therefore did not receive damages to which it was not entitled, nor did the punitive damages amount to a double recovery.

As part of its award of actual damages under its negligence claim, OSCO received the profits it lost as a result of Cincinnati's failure to timely process OSCO's claim, which delay prevented OSCO from replacing and reselling the damaged inventory. Cincinnati never challenged the propriety of the award of lost profits under OSCO's negligent procurement claim. Just as Cincinnati's handling of the claim was relevant to OSCO's actual damages under its negligent procurement claim,[5] it was also relevant to the award of punitive damages under the claim. The jury was therefore entitled to consider Cincinnati's conduct while processing OSCO's claim when assessing punitive damages. We have thoroughly reviewed the record and find no error in the instructions to the jury during the punitive damages phase of the trial.

## VIII.

In summary, we conclude the trial court's order thoroughly and correctly disposed of the issues Cincinnati and Bryant raised in their posttrial motions. As a final comment, we observe that "[l]itigants, whether plaintiffs or defendants, are entitled to fair trials but not perfect trials." *Ketterman v. South Carolina Farm Bureau Mut. Ins. Co.*, 302 S.C. 276, 279, 395 S.E. (2d) 187, 189 (Ct. App. 1990), *cert. denied.* This motion was cogently expressed by the Supreme Court of South Carolina in *Smoak v. Seaboard Coast Line Railroad Co.*, 259 S.C. 632, 193 S.E. (2d) 594 (1972), in which the Court stated:

The defendant is not entitled to a perfect trial, but only

---

[5] *See Nichols v. State Farm Mut. Auto. Ins. Co.*, 279 S.C. 336, 306 S.E. (2d) 616 (1983) (actual damages may include damages from an insurer's unreasonable action in processing a claim).

a fair trial. Hardly any case is completed without some flaw. If a new trial was required every time a flaw or mere possibility of prejudice occurred, litigation would be unduly prolonged. Our Court has held many times that such matters are basically for the sound discretion of the trial judge.

*Id.*, 259 S.C. at 640, 193 S.E. (2d) at 598. Likewise, from our thorough review of the voluminous record before the Court, we find that, although the trial may not have been perfect, Cincinnati and Bryant received a fair trial. We commend the trial judge for his skill and patience in handling such a long and complex trial.

Accordingly, the judgment is

Affirmed.

CURETON and GOOLSBY, JJ., concur.