498 S.E.2d 395

Richard B. HAWKINS, as Administrator of the Estate of Susan T. Hawkins, Deceased, for the Benefit of Richard B. Hawkins, Husband of the Deceased, and Jacob Nathaniel Hawkins and Charles Jordan Harkins, Minor Children of the Deceased, Respondent/Appellant,

v.

PATHOLOGY ASSOCIATES OF GREENVILLE, P.A. and Eugene C. Cox, M.D., Appellants/Respondents.

No. 2780.

Court of Appeals of South Carolina.

Heard Nov. 4, 1997.

Decided Jan. 12, 1998.

Rehearing Dismissed March 17, 1998.

96

98

G. Dewey Oxner, Jr., and Sally McMillan Purnell, both of Haynsworth, Marion, McKay & Guerard, Greenville, for appellants/respondents.

D. Michael Parham, of Parham & Smith, of Greenville; Dennis T. Cathey, of Cathey & Strain, Cornelia, GA; and James Lee Ford, of Ford & Felton, Atlanta, GA, for respondent/appellant.

HUFF, Judge:

Richard B. Hawkins, as the administrator of the estate of Susan T. Hawkins, brought wrongful death and survival actions against Pathology Associates of Greenville and Eugene C. Cox, M.D., hereinafter Pathology Associates. The jury awarded Hawkins $1,100,000 in the wrongful death action and $3,500,000 in the survival action. The trial court denied Pathology Associates's motions for new trial and/or new trial *nisi* in both actions. In addition, the trial court granted Pathology Associates's motion for set-off of a previous settlement. Both parties appeal. We affirm in part and reverse in part.

## FACTS

In October of 1988, when Mrs. Hawkins was five weeks pregnant with her first child, her doctor at Piedmont Ob/Gyn in Greenville took a Pap smear. The smear was sent to Pathology Associates of Greenville for analysis. The cytotechnologist who examined Mrs. Hawkins's smear had some questions about the endocervical cells and forwarded the slide to Dr. Cox, a pathologist, for his review. Dr. Cox observed abnormal cellular conditions but determined the changes were due to pregnancy. He diagnosed the smear as benign. Mrs. Hawkins's child was born on June 13, 1989. At her six week postpartum exam, her doctor took another Pap smear. A different cytotechnologist at Pathology Associates examined this smear. The cytotechnologist interpreted the cellular changes she saw on the smear to be normal postpartum changes and diagnosed the smear as benign. She did not ask Dr. Cox to review the slide.

Mrs. Hawkins became pregnant with her second child in the fall of 1990. At that time, she and her husband were living in Germany, where Mr. Hawkins was stationed in the army. Mrs. Hawkins saw a military doctor on October 23, 1990. Because of her history of hypertension, she went to a German obstetrician for her pregnancy and delivery. She had nine prenatal visits, but she did not have a Pap smear during this second pregnancy.[1] Her second son was born June 20, 1991. The delivery was difficult; her cervix was badly lacerated and required much suturing.

After giving birth, Mrs. Hawkins experienced more bleeding than she had after the first baby. In September of 1991, she and Mr. Hawkins left Germany and returned to Mrs. Hawkins's home town of Toccoa, Georgia. She continued to experience occasional vaginal bleeding, i.e. "spotting." At some point, Mr. and Mrs. Hawkins discussed the possibility of seeking a gynecological evaluation of why she continued bleeding. The doctor they saw after delivery of their second child indicated the bleeding was normal. In November of 1991, Mrs. Hawkins experienced a very bad vaginal bleeding epi-

1. The standard of care of the German doctors that treated Mrs. Hawkins was different from that in the United States, which requires a Pap smear during the pregnancy or at the postpartum examination.

sode where she was weakened from the loss of blood. She saw Dr. C.D. Gilbert, her mother's doctor in Toccoa, on November 14, 1991. Upon examination, Dr. Gilbert observed healing lacerations, increased blood vessels, and a granulated type tissue on her cervix. He did not perform a Pap smear or a biopsy. He thought it would be best to give the lacerations more time to heal and recommended Mrs. Hawkins return in January.

Mrs. Hawkins did not return for the recommended January evaluation. Mr. Hawkins testified she did not seek treatment with Dr. Gilbert again because the symptoms subsided. During the next months, she continued to experience occasional spotting, but this happened less frequently than in the fall. However, on March 25, 1992, she suffered another severe bleeding episode. Mr. and Mrs. Hawkins decided she would return to the doctors at Piedmont Ob/Gyn, who had delivered their first child.

On March 26, 1992, Mrs. Hawkins went to Dr. Mark T. Moore with Piedmont Ob/Gyn in Greenville. He discovered a tumor the size of a fist on her liver and that the cervix had been replaced by a tumorous mass. He took a biopsy, which was sent to Pathology Associates.

Dr. Jesse Stafford of Pathology Associates examined the biopsy taken in March of 1992. He determined the overall findings represented an adenosquamous carcinoma of apparent cervical origin. After Dr. Stafford made this diagnosis, he reviewed the 1988 and 1989 Pap smears. He testified, in retrospect, looking at the smears with the later diagnosis of cancer, both smears indicated precursor lesions. Precursor lesions are changes that, if not treated or corrected, can progress to full blown invasive cervical cancer.

After Mrs. Hawkins was diagnosed with cancer she went to Virginia and consulted with Dr. Ueno. Dr. Ueno confirmed the diagnosis of cancer and recommended combination chemotherapy. Mrs. Hawkins had her first chemotherapy in Virginia then returned to South Carolina. Dr. Mark Allen O'Rourke, an oncologist in Greenville, took over medical care of Mrs. Hawkins. He first saw Mrs. Hawkins on April 24, 1992. He testified that when he found the cancer had spread to the liver, he realized her condition was terminal. He told

Mrs. Hawkins that her cancer had reached the incurable stage. He aimed treatment at pain control and trying to slow down the cancer. By June, he determined Mrs. Hawkins was not responding to his treatment and referred her to Dr. Clark Pearson at Duke. Dr. Pearson recommended radiation therapy, which she began receiving to her liver and cervix area. During this treatment it was discovered the cancer had spread to her spine.

Both the cancer and the treatment caused Mrs. Hawkins to experience great pain, discomfort, and depression. The side effects of chemotherapy are nausea that requires intravenous antinausea medicine, loss of hair, a low blood count that makes the patient susceptible to infection, irritation of the lining of the throat and intestines, and fatigue. She underwent four cycles of chemotherapy infusion, at three week intervals. Mrs. Hawkins became bloated beyond recognition. She had a catheter placed in her vein for receiving chemotherapy, and constantly feared infection. She received approximately twenty-five doses of radiation therapy. She suffered severe burns from the radiation. Once the cancer spread to her spine, she was in so much pain she had to sleep sitting up on the couch. Because she could not take care of her children, she became even more depressed.

When the chemotherapy and radiation treatment were unsuccessful, Mr. and Mrs. Hawkins went to a clinic in Mexico for unorthodox treatments in late September, 1992. Mrs. Hawkins needed a blood transfusion as soon as they arrived in Mexico. On October 2 they flew home. Mrs. Hawkins returned to their home in Toccoa rather than a hospital. For the last ten to fourteen days of her life, Mrs. Hawkins was in constant pain. On the morning of October 27, 1992, she slipped into a coma. She died that afternoon, seven months after she had been diagnosed with cancer. She was thirty-two years old.

Dr. William Johnston, an expert in the practice of cytology testified how Pap smears are evaluated at Duke University. He stated that in most laboratories in the United States, cytotechnologists have authority to make the final decision that a Pap smear is normal. He recounted that in his lab, if *any* abnormality is present on the smear, the cytotechnologist

must refer the smear to the pathologist, regardless of his or her personal opinion about the significance of the abnormality. Dr. Johnston testified that when precursor lesions are detected in the early stages of development, the treatment is fairly simple and the cure rate is greater than ninety-five percent. Dr. Johnston examined the 1988 and 1989 Pap smears and found profound abnormalities in both. In his opinion, the abnormalities were very obvious and depicted carcinoma in situ, or preinvasive cancer. The smears could not be interpreted as coming from a normal pregnancy and postpartum condition. He stated Pathology Associates negligently deviated from the standard of care in the interpretation and reporting of Mrs. Hawkins's 1988 and 1989 Pap smears. Dr. Johnston believed the cancerous cells from the 1992 biopsy were a progression of the disease that could have been clearly observed on the 1988 and 1989 Pap smears. In his opinion, if the Pap smears had been appropriately diagnosed, there was a probability of over ninety-five percent that Mrs. Hawkins's life could have been saved.

Dr. Stanley J. Robboy, an expert specializing in obstetrical and gynecological pathology, also testified he viewed the Pap smear slides in question and determined they depicted "pretty clear cut carcinoma in situ in both 1988 and 1989." He stated the abnormalities were straight forward and obvious. Like Dr. Johnston, Dr. Robboy thought the abnormalities in the smears could not be accounted for by a pregnancy or postpartum condition. If Mrs. Hawkins had been treated after the 1988 or the 1989 smears, her chances for survival would have been over ninety-five percent.

Dr. Harlem Giles, an obstetrician/gynecologist testified that if the cancer had been diagnosed in November of 1991 by Dr. Gilbert, Mrs. Hawkins's chances for survival would have been more likely than not. However, the tumor was most likely invasive at that time, and treatment would have most likely required a radical hysterectomy and a pelvic operation followed by radiation treatment. He testified metastasis occurred between November and March.

According to Dr. O'Rourke, Mrs. Hawkins had cancer in November 1991, based on Dr. Gilbert's diagram of the cervix. Dr. Gilbert's records showed no indication of liver metastasis

by his physical examination of Mrs. Hawkins, and it was difficult to determine whether the cancer had already metastasized at that time. Dr. O'Rourke stated that in November 1991, the cancer had the potential to be cured by surgery or radiation.

Dr. Moore testified, based on the notes from the exam Dr. Gilbert performed in November of 1991, there was no evidence of metastasis at that point. In addition, he stated the standard of care for females of Mrs. Hawkins's age was to a have a Pap smear on an annual basis. The yearly Pap smear is needed because a number of Pap smears are reported negative but actually are positive. In general, it was also the standard of care for a woman to have a postpartum Pap smear.

Dr. Robert D. Coston, an economist, was qualified as an expert in the field of economic forecasting. He calculated the economic loss suffered as a result of Mrs. Hawkins's death as $1,146,023.28, based on her potential earnings, household contributions and employment benefits.

## ISSUES

1. Whether the trial judge erred in striking the defense of contributory negligence.

2. Whether the trial judge erred in admitting into evidence certain letters written by the decedent and a video tape of the decedent and her family.

3. Whether the trial judge erred in excluding evidence that Mr. Hawkins brought a separate wrongful death claim against Dr. Gilbert in Georgia.

4. Whether the trial judge erred in submitting the issue of punitive damages to the jury and admitting evidence of both the gross and net earnings of Pathology Associates.

5. Whether the trial judge erred in allowing counsel for Mr. Hawkins to specify in closing arguments the amount of damages which should be awarded.

6. Whether the trial judge erred in denying Pathology Associates's motions for a new trial and new trial *nisi* on the survival action on the grounds the verdict was grossly excessive.

7. Whether the trial judge erred in finding a Georgia settlement in the case against Dr. Gilbert should be set off against the South Carolina jury verdict in the wrongful death action.

## LAW/ANALYSIS

### 1. Contributory Negligence

At the close of both cases, the trial judge held there was no evidence of contributory negligence on the part of the decedent, and declined to charge the defense. Pathology Associates argues the trial judge erred in essentially striking the defense of contributory negligence. We disagree.

The South Carolina Supreme Court abrogated the doctrine of contributory negligence in favor of comparative negligence for all causes of action arising on or after July 1, 1991. *Nelson v. Concrete Supply Co.*, 303 S.C. 243, 399 S.E.2d 783 (1991). A cause of action accrues at the moment when the plaintiff has a legal right to sue on it. The fact that substantial damages did not occur until later is immaterial to determining when the cause of action accrued or arose. *Stephens v. Draffin*, 327 S.C. 1, 488 S.E.2d 307 (1997) Mrs. Hawkins's right to sue Pathology Associates arose with the allegedly negligent misdiagnosis of the 1988 and 1989 Pap smears. Therefore, the doctrine of contributory negligence applies to the survival action. In contrast, a cause of action for wrongful death arises only upon the death of the injured person and does not exist prior to death. *Claussen v. Brothers*, 148 S.C. 1, 145 S.E. 539 (1928). Mrs. Hawkins died on October 27, 1992. Accordingly, the doctrine of comparative negligence rather than contributory negligence applies to the wrongful death action, and the trial judge did not err in failing to charge contributory negligence in the wrongful death cause of action. As to the survival cause of action, we agree with the trial judge that no evidence was presented that decedent was contributorily negligent.

Contributory negligence is a lack of ordinary care on the part of a person injured by the negligence of another which combines and concurs with that other's negligence and contributes to the injury as a proximate cause without which the injury would not have occurred. The doctrine of con-

tributory negligence embodies the principle that an injured person should not be permitted to ask from others greater care than he himself exercises for his own welfare. If in the exercise of ordinary care, the plaintiff might have avoided the consequences of the defendant's negligence, he is the author of his own injury in the eyes of the law.

*Wallace v. Owens–Illinois, Inc.,* 300 S.C. 518, 522–523, 389 S.E.2d 155, 157 (Ct.App.1989).

■ The question of contributory negligence is ordinarily a question of fact for the jury. If the inferences to be drawn from the testimony are doubtful, the question as to whether the plaintiff is contributorily negligent is for the jury to determine. The question of contributory negligence becomes a question of law for the courts only when the evidence is susceptible to but one reasonable inference. In determining whether a plaintiff is contributorily negligent as a matter of law, the evidence of the whole case must be viewed in the light most favorable to the opposing party. *Wallace v. Owens–Illinois, Inc., supra.*

■ Pathology Associates first contends, because it is the standard of care for females in Mrs. Hawkins's age group to receive annual Pap smears, her failure to obtain yearly Pap smears was evidence of contributory negligence. We disagree. First, there is no evidence Mrs. Hawkins was ever informed of the necessity of a yearly Pap smear. Further, the record shows Mrs. Hawkins had a Pap smear taken on July 31, 1989 after the birth of her first child. Mrs. Hawkins saw a doctor in Germany on October 23, 1990 to confirm her second pregnancy and had numerous pre-natal appointments. Thus, only a year and three months passed between her gynecological examinations. The only evidence is that Mrs. Hawkins relied on the physician in Germany for her obstetrical and gynecological care. Finally, while there is evidence of record that the standard of care in the United States requires annual Pap smears, this is the standard applicable to the physician, not the patient. The record further shows this standard is not the same in Germany.

■ Pathology Associates also contends Mrs. Hawkins was negligent in failing to have a postpartum Pap smear or have a Pap smear prior to November of 1991 when she saw Dr.

Gilbert. Again, while the standard of care in the United States provides a woman should receive annual Pap smears and postpartum Pap smears, this is the standard applicable to the physician. There is no evidence Mrs. Hawkins was advised to return at any given time for a Pap smear. She was under the care of the German physician at least through July 1991, and returned to the United States in September 1991. Only two months later, she came under Dr. Gilbert's care for gynecological problems. We find no evidence of contributory negligence on this basis.

█ Next, Pathology Associates asserts Mrs. Hawkins was negligent in failing to seek medical attention for the continued bleeding she experienced after the birth of her first child and in failing to keep her follow up appointment with Dr. Gilbert. Pathology Associates cites *Baxley v. Rosenblum*, 303 S.C. 340, 400 S.E.2d 502 (Ct.App.1991) for this proposition. Baxley sued Rosenblum, his doctor, for failing to diagnose and treat him correctly for cancer. This court found the plaintiff's own negligent conduct contributed substantially to his injuries. The court found the following among other factors evidenced Baxley's contributory negligence: (1) Baxley, who was also a doctor, failed to inform Rosenblum of all of his symptoms, (2) Baxley ignored his doctor's advice and stopped seeing him for over a year, (3) when his symptoms worsened and he did not respond to self treatment, Baxley did not seek treatment, and (4) when he finally sought treatment, he went to a nonspecialist instead of Rosenblum, the specialist he had consulted for years. The court explained, "As a doctor himself, [Baxley] also knew that many chronic diseases are progressive, that a patient's delay in seeing a physician can prevent early diagnosis, and that delay in diagnosis can materially alter the chances for successful treatment by conservative means." *Id.* at 347, 400 S.E.2d at 507. The court held a reasonable jury could have interpreted the delay as a critical factor in the extent of Baxley's injuries. Thus the issue of contributory negligence must have been submitted to the jury.

The facts in *Baxley* are clearly distinguishable from the facts in this case. Unlike Baxley, who was a medical doctor and knew his symptoms were those of a chronic disease, Mrs. Hawkins had no reason to be aware that her symptoms were caused by a life-threatening condition. Although she had two

abnormal Pap smears during her first pregnancy, no one alerted her to this and she was unaware of any potential problems. She had an intervening pregnancy with a difficult delivery. She experienced more bleeding after this pregnancy but had no grounds to suspect cancer. To the contrary, there is evidence of record that she was told that bleeding after delivery was normal. When she experienced more severe bleeding, she immediately sought medical treatment. However, Dr. Gilbert simply told her to come back in two months. He gave her no notice or diagnosis of a possibility of cancer. When the symptoms abated somewhat after the November bleeding episode, she did not return as Dr. Gilbert had suggested. There is no evidence Dr. Gilbert conveyed to her that her symptoms were serious or urgent. The first time she was clearly put on notice that her symptoms were of life threatening genesis was when she sought treatment from Dr. Moore. By then it was too late and her cancer was terminal.

The facts and the record as a whole support the trial court's finding that there was no evidence that Mrs. Hawkins was contributorily negligent. Accordingly, we find no error.

## 2. Admission of Letters and Videotape

Pathology Associates next argues the lower court erred in admitting into evidence certain letters from Mrs. Hawkins to her family and a video tape of the Hawkins family. It claims the letters and the audio portion of the video tape were inadmissible hearsay and were extremely prejudicial, inflammatory and self-serving.

Before direct testimony began, the parties and the judge discussed the admissibility of evidence outside of the presence of the jury. During this hearing, Pathology Associates objected to a videotape of the Hawkins family, and a card and letters Mrs. Hawkins wrote to Mr. Hawkins and the children. Pathology Associates argued the items were hearsay, prejudicial and that they violated the Dead Man's statute. The trial judge ruled he would allow the video to be played and would allow the cards and letters as well.

After a lunch recess, Mr. Hawkins testified. During his testimony, Pathology Associates objected when Mr. Hawkins read the anniversary card aloud. The trial court recognized

defense counsel had already noted an objection. Mr. Hawkins then read a letter Mrs. Hawkins wrote to him on Father's Day 1991 and letters she wrote to him and their children shortly before she died. The video tape was played for the jury as Mr. Hawkins described what was occurring on the video. However, the video was never entered into evidence.

On appeal, Pathology Associates contends the letters, card, and video were inadmissible hearsay and the trial judge committed prejudicial error in admitting them into evidence. We disagree. The trial court's ruling on the admission of evidence will not be disturbed on appeal absent an abuse of discretion amounting to an error of law. *Hoeffner v. The Citadel,* 311 S.C. 361, 429 S.E.2d 190 (1993). Rule 801(c), SCRE defines hearsay as, "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The letters, card and video were not offered to prove the truth of any matter asserted, but to show the close family relationship, and they were clearly relevant to the issue of damages. In addition, the card and letters would fall under the hearsay exception of an existing state of mind, emotion, sensation, or physical condition. Rule 803(3), SCRE. It should be further noted, although Pathology Associates complains of the video's admission into evidence, the video was not, in fact, admitted into evidence, but apparently was simply played before the jury. The record does not contain a transcript of the audio portion of the video, but only testimony of Mr. Hawkins describing who is depicted on the video. From the limited description of the video given during the husband's testimony, it is impossible to discern any prejudice to Pathology Associates from the playing of this video and Pathology Associates has failed to point out any prejudicial statements or depictions from this video tape. We therefore find no error.

### 3. Exclusion of Georgia Complaint

■■■ Next, Pathology Associates contends the trial judge erred in sustaining an objection to its attempt to question Mr. Hawkins regarding the fact that he filed a wrongful death lawsuit in Georgia against Dr. Gilbert, the doctor whom Mrs. Hawkins saw in November of 1991. We disagree.

The record shows Pathology Associates attempted to question Mr. Hawkins regarding a wrongful death complaint filed in Georgia against Dr. Gilbert and his clinic. Counsel for the estate objected. The trial judge found the line of questioning irrelevant and sustained counsel's objection. Pathology Associates argues this line of questioning was relevant to their plea of contributory negligence because it was an admission by Mr. Hawkins that if Mrs. Hawkins had sought treatment prior to November 1991, she would have probably survived.

■ The determination of relevancy of evidence is largely within the trial court's discretion. *Hoeffner, supra.* We find no abuse of discretion in the exclusion of this line of questioning. As previously noted, there is no evidence of record that Mrs. Hawkins was contributorily negligent for failure to seek medical advice sooner. The fact that a physician may have contributed to her death by failing to properly diagnose her serious condition in November 1991 simply is not evidence of contributory negligence on the part of Mrs. Hawkins.

4. Punitive Damages and Admission of Gross Earnings

Pathology Associates claims the trial court erred in submitting the issue of punitive damages to the jury and allowing the publishing of the gross and net earnings of Pathology Associates. We disagree.

After the close of evidence, the lower court denied Pathology Associates's motion to strike punitive damages from the verdict form. Over objection, the trial judge held Hawkins could introduce evidence of Pathology Associates's gross revenues rather than just its net profit.

On appeal, Pathology Associates first contends the trial judge erred in admitting evidence of its gross and net income because there was no evidence to sustain a claim for punitive damages.

■ Punitive damages may be awarded in South Carolina when there is clear and convincing evidence that the conduct of the defendant is willful, wanton, or in reckless disregard of the plaintiff's rights. S.C.Code Ann. § 15–33–135 (Supp.1996); *McGee v. Bruce Hosp. System,* 321 S.C. 340, 468 S.E.2d 633 (1996); *Taylor v. Medenica,* 324 S.C. 200, 479

S.E.2d 35 (1996). A conscious failure to exercise due care constitutes willfulness. *McCourt v. Abernathy*, 318 S.C. 301, 457 S.E.2d 603 (1995). A tort is characterized as reckless, willful or wanton if it was committed in such a manner or under such circumstances that a person of ordinary reason and prudence would have been conscious of it as an invasion of the plaintiff's rights. *Taylor v. Medenica, supra.* The issue of punitive damages must be submitted to the jury if more than one reasonable inference can be drawn from the evidence as to whether the defendant's behavior was reckless, willful, or wanton. *Graham v. Whitaker*, 282 S.C. 393, 321 S.E.2d 40 (1984).

Mr. Hawkins's expert witnesses described the abnormal cells present on the 1988 and 1989 Pap smears as clear cut, profound, straight forward and obvious. They further stated Pathology Associates's misdiagnosis of both smears constituted a deviation from the standard of care, and had Mrs. Hawkins been properly diagnosed, her chances for survival were greater than ninety-five percent. Accordingly, we find there was sufficient evidence from which the jury could find Pathology Associates acted recklessly or willfully. Thus, the trial court did not err in submitting the issue of punitive damages to the jury.

Pathology Associates next argues the trial court erred in allowing into evidence the gross and net earnings of Pathology Associates because the amounts were prejudicial and influenced the jury's verdict on actual damages. The admission of evidence of the earnings was in the discretion of the trial court. *See Hoeffner v. The Citadel, supra.* One of the factors to be considered in determining the amount of punitive damages is the defendant's ability to pay. *Gamble v. Stevenson*, 305 S.C. 104, 406 S.E.2d 350 (1991). Testimony of periodic earnings is clearly relevant on the issue of a defendant's ability to pay an award. *Orangeburg Sausage Co. v. Cincinnati Ins. Co.*, 316 S.C. 331, 450 S.E.2d 66 (Ct.App.1994). The trial court found Mr. Hawkins was entitled to present evidence of Pathology Associates's gross income, but ruled Pathology Associates could present evidence to reduce that amount to show the actual profits earned. We find the trial judge did not abuse his discretion.

### 5. Closing Argument

█ Pathology Associates next contends the trial court erred in allowing counsel for Mr. Hawkins to specify an exact amount the jury should award in both the survival and wrongful death action.

During closing argument Mr. Hawkins's attorney told the jury,

What I say is not the mathematical word here. It's up to you and your enlightened conscious as to what is an appropriate award to make to my clients for the losses they've suffered, and we're asking you to consider an award for each of the children, for Jacob and Jordan of two million dollars, two million dollars for Jacob and two million dollars for Jordan.

The attorney also asked for the jury to award Mr. Hawkins one million dollars. He estimated the total amounts to be six million, four hundred and sixty thousand dollars. Then he asked the jury to consider awarding one million, one hundred thousand dollars in the survival action.

Pathology Associates raised no objection during closing argument. After closing arguments, court was recessed for a short break. Pathology Associates then asked the trial judge for a curative instruction that the jury should disregard the figures suggested by counsel in his closing. The trial judge denied this request.

█ A contemporaneous objection is required to preserve an issue for appellate review. *Taylor v. Medenica, supra*. The proper course to be pursued when counsel makes an improper argument is for opposing counsel to *immediately* object and to have a record made of the statements or language complained of and to ask the court for a distinct ruling thereon. *State v. Black*, 319 S.C. 515, 462 S.E.2d 311 (Ct.App.1995). Because Pathology Associates failed to make a contemporaneous objection, the issue is not preserved for appellate review.

█ Furthermore, even if the argument were properly preserved, we find no basis for reversal. The jury clearly rejected Hawkins's counsel's suggestion for damages. The jury awarded $1.1 million in the wrongful death action, when

counsel had suggested over $6 million, and awarded $3.5 million in the survival action instead of the $1.1 million suggested by counsel. Therefore, counsel's statements were harmless. *See McKissick v. J.F. Cleckley & Co.*, 325 S.C. 327, 479 S.E.2d 67 (Ct.App.1996) (errors are harmless where they could not have reasonably affected the trial).

### 6. New Trial Motions

Pathology Associates further asserts the trial court erred in not granting its motions for a new trial or a new trial *nisi* in the survival case on the ground that the amount of the verdict was grossly excessive. We disagree.

The trial judge alone has the power to grant a new trial *nisi* when he finds the amount of the verdict to be merely inadequate or excessive, and the denial of such a motion will not be reversed on appeal absent an abuse in the trial judge's discretion. The trial judge should grant a new trial absolute based on excessiveness of the verdict only if the amount is not merely different from that which he would have awarded, but is so grossly excessive so as to shock the conscience of the court and clearly indicates the figure reached was the result of caprice, passion, prejudice, partiality, corruption, or other improper motives. *McCourt, supra.*

Mrs. Hawkins spent seven months engaged in a painful battle for her life, which she knew from the beginning she would lose. In addition to the excruciating physical pain she suffered, she endured the mental anguish of spending the last several months of her life unable to care for her two small children. For seven months she knew she was terminally ill and that her children would have to grow up without their mother. The evidence further demonstrated her consternation over the loss of a normal relationship with her husband. We find the jury's verdict to be reasonably reflective of the pain, physical and mental suffering, and lack of quality of life Mrs. Hawkins endured during her fight with cancer. We find no abuse of discretion.

### 7. Offset of the Georgia Settlement

Hawkins argues the trial court erred in finding the Georgia settlement should be set off against the South Car-

olina jury verdict because the damages recoverable in each claim were not the same.

> The jurisdiction of the Court to set off one judgment against another is equitable in its nature, and should be exercised so as to do justice between the parties. It is not founded on any statute or fixed rule of court, but grows out of the inherent equitable jurisdiction which the court exercises over suitors in it. Such motions are therefore addressed to the discretion of the court—a discretion which is not arbitrary or capriciously exercised, but according to settled principles.

*Rookard v. Atlanta & Charlotte Air Line Railway Co.*, 89 S.C. 371, 71 S.E. 992, 995 (1911).

 A nonsettling defendant is entitled to credit for the amount paid by another defendant who settles. *Powers v. Temple*, 250 S.C. 149, 156 S.E.2d 759 (1967); *Vaughn v. City of Anderson*, 300 S.C. 55, 386 S.E.2d 297 (Ct.App.1989). The Supreme Court explained, "[t]he reason for allowing such a credit is to prevent an injured person from obtaining a second recovery of that part of the amount of damages sustained which has already been paid him. Or differently stated, it is almost universally held that there can be only one satisfaction for an injury or wrong." *Truesdale v. South Carolina Highway Dept.*, 264 S.C. 221, 213 S.E.2d 740 (1975). However, the reduction in the judgment must be from a settlement for the same cause of action. *Ward v. Epting*, 290 S.C. 547, 351 S.E.2d 867 (Ct.App.1986) (refusing to apply settlement for pain and suffering cause of action to judgment in wrongful death action). Therefore, the decision on this issue turns on whether the Georgia wrongful death statute, Ga.Code Ann. § 51–4–1, et. seq. (1982 & Supp.1997), constitutes the same cause of action as the South Carolina Wrongful Death Act. S.C.Code Ann. § 15–51–10 et seq. (1976 & Supp.1996).

The Georgia statute provides a surviving spouse may recover the "full value of the life of the decedent, as shown by the evidence." O.C.G.A. § 51–4–2(a) (Supp.1997). "The 'full value of the life of the decedent' consists of two elements: the economic value of the deceased's normal life expectancy and the intangible element capable of exact proof." *Miller v. Jenkins*, 201 Ga.App. 825, 412 S.E.2d 555 (1991). The damages recovered under the statute may include the value of the intangible relationship between the decedent and his family. *McQurter v. City of Atlanta, Ga.*, 572 F.Supp. 1401 (N.D.Ga.

1983). However, the Georgia statute does not permit recovery for the grief and mental anguish of the person bringing the lawsuit. *Young Men's Christian Association v. Bailey,* 112 Ga.App. 684, 146 S.E.2d 324, 341 (1965).

In contrast, under the South Carolina wrongful death statute, the question of damages is not directed toward the value of the human life that was lost, but rather the damages sustained by the beneficiaries as a result of the death. *Self v. Goodrich,* 300 S.C. 349, 387 S.E.2d 713 (Ct.App. 1993); *see Zorn v. Crawford,* 252 S.C. 127, 165 S.E.2d 640 (1969).

> The general elements of damages recoverable are: (1) pecuniary loss, (2) mental shock and suffering, (3) wounded feelings, (4) grief and sorrow, (5) loss of companionship, and (6) deprivation of the use and comfort of the intestate's society, including the loss of his experience, knowledge, and judgment in managing of the affairs of himself and of his beneficiaries.

*Self,* at 351, 387 S.E.2d at 714; *see Smith v. Wells,* 258 S.C. 316, 188 S.E.2d 470 (1972); *Mishoe v. Atlantic Coast Line R.R. Co.,* 186 S.C. 402, 197 S.E. 97 (1938).

The only common element of damages between the South Carolina and Georgia Wrongful Death statutes is the award for the economic value of the deceased's life expectancy. Hawkins settled with Dr. Gilbert for $550,000 pursuant to the Georgia wrongful death statute. The economist valued the economic loss to the family as a result of Mrs. Hawkins death as $1,146,023.28. The jury awarded Hawkins $1,100,000 in the wrongful death action. Neither party requested the jury specify the amount it awarded for each of the elements of the damages under the South Carolina statute. Although the pecuniary loss estimated by the economist exceeded the total amount awarded in the wrongful death action, there is no evidence in the record to indicate how the jury calculated the award. The jury may have discounted the economist's testimony about Mrs. Hawkins's economic contributions and based the award primarily on the grief Mrs. Hawkins's husband and two children suffered and will continue to suffer as a result of her death. Pathology Associates failed to establish the jury awarded at least $550,000 entirely from the pecuniary loss

suffered. The evidence does not support the trial court's finding the set-off was necessary to prevent Hawkins from receiving a double recovery for the same damages. The trial court abused its discretion in reducing the jury award for wrongful death against the survival action. The order allowing set-off is reversed.

**AFFIRMED IN PART AND REVERSED IN PART.**

CONNOR and ANDERSON, JJ., concur.