720 S.E.2d 473

**CODY P., by and through his Conservator Kelly H. Kelley, and his natural and legal guardian Elizabeth Powell, Respondents,**

**v.**

**BANK OF AMERICA, N.A., Karen P. Unrue, and Travis Powell, Defendants,**

**of whom Bank of America, N.A. is the Appellant.**

**No. 4875.**

Court of Appeals of South Carolina.

Heard Dec. 8, 2010.
Decided Aug. 23, 2011.
Rehearing Denied Dec. 12, 2011.

612

614

616

C. Mitchell Brown, Clarence Davis, T. William McGee, III, and A. Mattison Bogan, all of Columbia, for Appellant.

W.E. Jenkinson, III, Jennifer R. Kellahan, and Ronnie A. Sabb, all of Kingstree, for Respondent.

LOCKEMY, J.

In this negligence action, a jury found Bank of America, North America (BOA) liable for negligence and awarded Cody P. by and through his Conservator, Kelly H. Kelley, and his natural and legal guardian Elizabeth Powell (collectively Powell) $205,735.37 in actual damages and $1,583,000 in punitive damages. BOA appeals arguing the trial court erred in denying its (1) motions for judgment notwithstanding the verdict (JNOV) as to negligence and punitive damages and (2) motion for a new trial based on the admission of evidence regarding its size. BOA also contends the trial court erred in finding the award of punitive damages was constitutionally proper. We affirm.

## FACTS

Steven Powell died in a tragic accident at work entitling his minor son, Cody, to approximately $252,000 in life insurance proceeds. Karen Unrue, Steven's sister, approached Elizabeth Powell, Steven's widow, and offered to manage the insurance proceeds for Cody. Unrue was a trusted family member who had occasionally assisted the Powells with managing their personal finances in the past. Powell agreed to allow Unrue to serve as conservator over the insurance pro-

ceeds. Unrue also suggested Steven's brother, Travis Powell, serve as co-conservator.

Powell petitioned the probate court to appoint Unrue and Travis as co-conservators, and after a hearing, the court appointed Unrue and Travis as co-conservators. The probate court also waived the bond requirement and ordered "that the funds of the minor child, [Cody], be deposited in a restricted account and that no funds be withdrawn or transferred from such account without written [o]rder of [the probate court]." The certificate of appointment and fiduciary letter included the following restriction: "No withdrawals without court order."

On Cody's behalf, Unrue received seven checks totaling $252,447.51. Three of the checks were made payable to her and Travis jointly and included the designation "Co-conservators For [Cody], A Minor" or "Co–Cn For Minor, [Cody]."[1] The other four checks were made payable to Unrue and included the designation "As Conservator Of [Cody], A Minor." Unrue endorsed the checks without including her title as co-conservator. Unbeknownst to Travis, Unrue forged his name on the three checks made payable to her and Travis as co-conservators and took all the checks to the Pawleys Island BOA. Unrue met with Lee Ann Yourko, a personal banker, and requested she open a certificate of deposit (CD) account. Yourko opened a CD account titled "Karen M. Unrue Guardian [Cody]." Yourko collected the checks and took them to a teller who processed the checks and deposited the proceeds into the CD account Yourko created. Neither Yourko nor the teller questioned the significance of the conservator designation in the payee line of the checks.

A few days later, Unrue returned to the Pawleys Island BOA with a single check for $253.67 made payable to her "As Conservator For Cody A Minor." Unrue met with branch manager Meredith Lawrence and requested she open a Uniform Gift to Minors Act (UGMA) account.[2] Lawrence opened

1. The checks were made to payable to Karen Powell, Unrue's maiden name. The order appointing Unrue as co-conservator, the certificate of appointment, and the fiduciary letter were also in Unrue's maiden name.

2. S.C.Code Ann. §§ 63–5–500 to –600 (2010).

a savings account titled "Karen M. Unrue—cust [Cody]—UMGA [sic]." Lawrence did not question the significance of the conservator title on the payee line of the check. Lawrence also failed to notice Unrue endorsed the check without including her title.

Approximately a month later, after the CD matured, Unrue entered the Garden City BOA and withdrew 100% of the funds, $253,991.50, from the CD account. Unrue took the funds to the Pawleys Island BOA and deposited them in the UGMA savings account. Over the next several months, Unrue made seven online transfers totaling $258,500 from the UGMA savings account to her personal checking account.

Powell initiated this action for negligence alleging BOA breached its duty to honor the restrictions set forth in the probate court's order, certificate of appointment, and fiduciary letter. Powell also sought actual and punitive damages. After a trial, the jury found in favor of Powell and awarded actual damages in the amount of $205,735.37 as stipulated by the parties. The jury also found BOA's conduct was willful, wanton, or reckless and awarded punitive damages in the amount of $1,583,000.

BOA sought a post-trial review of the punitive damages award alleging it was improper under *Gamble v. Stevenson,* 305 S.C. 104, 406 S.E.2d 350 (1991), and *State Farm Mutual Automobile Insurance Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). BOA moved for JNOV as to Powell's negligence claim and the award of punitive damages. BOA also moved for a new trial arguing the trial court erred in allowing the admission of evidence regarding its size. After a hearing, the trial court denied BOA's post-trial motions and determined the award of punitive damages was constitutionally proper. This appeal followed.

## LAW/ANALYSIS

### I. Judgment Notwithstanding the Verdict: Negligence

BOA argues the trial court erred in denying its motion for JNOV on Powell's negligence claim because Unrue's actions were unforeseeable intervening acts that proximately caused Powell's loss.[3] We disagree.

---

3. BOA also argues Powell failed to prove it was the cause-in-fact of the injury. However, BOA failed to raise this issue in its directed verdict

■ In ruling on a motion for JNOV, the trial court must view the evidence, and the inferences that can reasonably be drawn from the evidence, in a light most favorable to the party opposing the motion. *McMillan v. Oconee Mem'l Hosp., Inc.*, 367 S.C. 559, 564, 626 S.E.2d 884, 886 (2006). The trial court should deny a motion for JNOV when the evidence yields more than one inference or its inferences are in doubt. *Id.* "This [c]ourt will reverse the trial court's rulings on [a motion for JNOV] only where there is no evidence to support the rulings or where the rulings are controlled by an error of law." *Hinkle v. Nat'l Cas. Ins. Co.*, 354 S.C. 92, 96, 579 S.E.2d 616, 618 (2003).

■ Generally, the elements of negligence are (1) duty, (2) breach, (3) proximate cause, and (4) injury. *Shipes v. Piggly Wiggly St. Andrews, Inc.*, 269 S.C. 479, 482–83, 238 S.E.2d 167, 168 (1977). To show the defendant was the proximate cause of the injury, the plaintiff must establish the defendant was both the cause-in-fact and the legal cause of the injury. *Mellen v. Lane*, 377 S.C. 261, 278, 659 S.E.2d 236, 245 (Ct.App.2008). The cause-in-fact requirement is proved by showing the injury would not have occurred but for the defendant's negligence. *Id.* The legal cause requirement is proved by establishing the plaintiff's injury was foreseeable. *Id.* at 278–79, 659 S.E.2d at 245.

■ Generally, an injury is foreseeable if it is the natural and probable consequence of the defendant's conduct in light of the attendant circumstances. *See Young v. Tide Craft, Inc.*, 270 S.C. 453, 462–63, 242 S.E.2d 671, 675–76 (1978); *Mellen*, 377 S.C. at 279–80, 659 S.E.2d at 246. However, "[a] special case is presented if the injury is independently caused by the intervening act of a third party." *Shepard v. S.C. Dep't of Corr.*, 299 S.C. 370, 375, 385 S.E.2d 35, 37 (Ct.App.1989). In that case, the general rule is "that when, between negligence and the occurrence of an injury, there intervenes a willful, malicious, and criminal act of a third person producing the injury, but that such was not intended by the negligent person

motion; accordingly, it is unpreserved for our review. *In re McCracken*, 346 S.C. 87, 92–93, 551 S.E.2d 235, 238 (2001) (finding only

and could not have been foreseen by him, the causal chain between the negligence and the accident is broken." *Stone v. Bethea*, 251 S.C. 157, 162, 161 S.E.2d 171, 173–74 (1968). In other words, "[t]he test is whether the intervening act and the injury resulting therefrom are of such a character that the author of the primary negligence should have reasonably anticipated them in light of the attendant circumstances." *Shepard*, 299 S.C. at 375, 385 S.E.2d at 38–39; *see Young*, 270 S.C. at 463, 242 S.E.2d at 676 ("Where there is a contention that an intervening agency interrupts the foreseeable chain of events, there are two consequences to be tested: (1) the injury complained of, and (2) the acts of the intervening agency.").

 "The law requires only reasonable foresight, and when the injury complained of is not reasonably foreseeable, in the exercise of due care, there is no liability." *Stone*, 251 S.C. at 161, 161 S.E.2d at 173. "One is not charged with foreseeing that which is unpredictable or that which could not be expected to happen." *Id.* at 161–62, 161 S.E.2d at 173. However, "it is not necessary that the actor should have contemplated the particular chain of events that occurred, but only that the injury at the hand of the intervening party was within the general range of consequences which any reasonable person might foresee as a natural and probable consequence of the negligent act." *Shepard*, 299 S.C. at 375, 385 S.E.2d at 38.

 Foreseeability is determined from the defendant's perspective at the time of the negligent act allegedly causing the plaintiff's injury. *Mellen*, 377 S.C. at 280, 659 S.E.2d at 246; *Shepard*, 299 S.C. at 375, 385 S.E.2d at 38 (noting "[f]oreseeability is to be judged from the perspective of the actor at the time of the negligent act, not after the injury has occurred"). Ordinarily, legal cause is a question of fact for the jury. *Oliver v. S.C. Dep't of Highways & Pub. Transp.*, 309 S.C. 313, 317, 422 S.E.2d 128, 131 (1992). "Only in rare or exceptional cases may the question of proximate cause be decided as a matter of law." *Ballou v. Sigma Nu General Fraternity*, 291 S.C. 140, 147, 352 S.E.2d 488, 493 (Ct.App. 1986). "The particular facts and circumstances of each case determine whether the question of proximate cause is for the court or for the jury." *Id.* "If there may be a fair difference

grounds raised in a directed verdict motion can be raised in a JNOV motion).

of opinion regarding whose act proximately caused the injury, then the question of proximate cause must be submitted to the jury." *Id.* at 147–48, 352 S.E.2d at 493. "Only when the evidence is susceptible to only one inference does it become a matter of law for the court." *Oliver,* 309 S.C. at 317, 422 S.E.2d at 131.

■■■ We find the trial court properly denied BOA's motion for JNOV on Powell's negligence claim. Here, Robert Hubbs, an expert in banking and banking operations, testified banks anticipate theft. Hubbs explained banks implement and follow standard policies and procedures for establishing accounts and negotiating checks that are designed to prevent theft. BOA's designated representative, Elizabeth Reeves, also explained that banks anticipate theft and implement safeguards to prevent the misappropriation of customer's funds. According to Reeves, when an individual is managing funds for another, additional safeguards are used by banks to protect the funds of the minor or incapacitated person.

BOA implemented policies and procedures designed to avoid fraud and loss situations. For instance, when creating an account for an individual who is appointed by the court to manage the funds of another, such as a conservatorship account, BOA is required to obtain an original or certified copy of the court order appointing the individual. If a court order is required for withdrawals, "Court Restricted Account" must be placed in the title of the account. If the court order contains restrictions, the employee creating the account is required to contact BOA Banking Group Support–Legal Support. When negotiating a check made payable to a payee with a title such as a conservator, BOA's Teller Operations Manual requires the employee to verify the authority of the payee. Individuals named on the "payable to" line of a check must endorse the check exactly as it is payable. Individuals with a title such as conservator or guardian must use the title when endorsing a check. In fact, BOA's Teller Operations Manual and Platform Manual conspicuously indicate the best way for employee's to avoid a fraud or loss situation is to "KNOW YOUR ENDORSER."

Furthermore, Unrue presented eight checks to BOA indicating she was a conservator or co-conservator. The conser-

vator title indicated to Yourko and Lawrence that Unrue was court appointed and court documents existed that they were required to request and review. However, Unrue never offered the court documents or otherwise alerted Yourko or Lawrence to her status as a court appointed conservator. Although BOA policy required Unrue to include her title when endorsing the checks, she endorsed the checks without including her title as conservator. Finally, Travis Powell was not present to negotiate the checks that listed him as co-conservator, even though BOA policy required his presence to negotiate the checks payable to him and Unrue jointly as co-conservators.

Reviewing the evidence in a light most favorable to Powell, we find the evidence presented at trial yields more than one inference regarding whether BOA should have reasonably foreseen Unrue's actions and the theft of Cody's funds in light of the attendant circumstances. Accordingly, we find the trial court properly denied BOA's motion for JNOV as to Powell's negligence claim.

## II. New Trial Motion: BOA's Size

 BOA argues the trial court abused its discretion in denying its motion for a new trial because allowing Powell to refer to its size during trial unfairly prejudiced BOA. We disagree.

 "The grant or denial of new trial motions rests within the discretion of the trial [court] and ... will not be disturbed on appeal unless [the trial court's] findings are wholly unsupported by the evidence or the conclusions reached are controlled by [an] error of law." *Vinson v. Hartley,* 324 S.C. 389, 405, 477 S.E.2d 715, 723 (Ct.App.1996). "In deciding whether to assess error to a court's denial of a motion for a new trial, we must consider the testimony and reasonable inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Id.* This court "reviews Rule 403[, SCRE,] rulings pursuant to an abuse of discretion standard and gives great deference to the trial court." *Lee v. Bunch,* 373 S.C. 654, 658, 647 S.E.2d 197, 199 (2007). "A trial [court's] decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in

exceptional circumstances." *Johnson v. Horry Cnty. Solid Waste Auth.,* 389 S.C. 528, 534, 698 S.E.2d 835, 838 (Ct.App. 2010) (quoting *State v. Adams,* 354 S.C. 361, 378, 580 S.E.2d 785, 794 (Ct.App.2003)) (internal quotation marks omitted).

■■■ Initially, Powell argues this issue is unpreserved because BOA failed to contemporaneously object to testimony regarding BOA's size. BOA moved *in limine* to exclude the deposition testimony of its designated representative, Floretta Denning. Specifically, BOA objected to Denning's statement that BOA is the "third largest bank in the world." The trial court denied BOA's motion. BOA contemporaneously objected to Denning's testimony when it was introduced at trial. A bench conference was held and the trial court overruled BOA's objection. Later, during a recess BOA requested the trial court state the grounds for overruling its objection on the record. The trial court explained it found the statement was not prejudicial in light of earlier testimony regarding the size of the bank where Cody's funds are currently deposited and its policies and procedures. During the remainder of trial, several references to BOA's size occurred in the jury's presence. We find this issue is preserved for our review. BOA was not required to continue objecting to preserve this issue for appeal. *See Staubes v. City of Folly Beach,* 339 S.C. 406, 415, 529 S.E.2d 543, 546–47 (2000) (concluding parties are not required "to engage in futile actions in order to preserve issues for appellate review").

Turning to the merits, we find BOA's argument is misplaced. At trial, BOA was referred to as "big," "the largest" bank in America, and the "third largest bank in the world" on several occasions in the jury's presence. These references were brief and isolated and occurred only a few times over the course of a four-day trial. We find no prejudice in merely referring to BOA as what it is; a big bank. Accordingly, the trial court properly denied BOA's motion for a new trial on this ground.

### III. Punitive Damages

#### A. JNOV

BOA argues the trial court erred in denying its motion for JNOV on punitive damages because Powell failed to present

clear and convincing evidence BOA's actions were willful, wanton, or undertaken in reckless disregard of Powell's rights. We disagree.

In order to recover punitive damages, the plaintiff must present clear and convincing evidence that the defendant's conduct was willful, wanton, or in reckless disregard of the plaintiff's rights. S.C.Code Ann. § 15–33–135 (2005) ("In any civil action where punitive damages are claimed, the plaintiff has the burden of proving such damages by clear and convincing evidence."); *Taylor v. Medenica*, 324 S.C. 200, 221, 479 S.E.2d 35, 46 (1996). "The test by which a tort is to be characterized as reckless, wil[l]ful or wanton is whether it has been committed in such a manner or under such circumstances that a person of ordinary reason or prudence would then have been conscious of it as an invasion of the plaintiff's rights." *Rogers v. Florence Printing Co.*, 233 S.C. 567, 577–78, 106 S.E.2d 258, 263 (1958); *see also Berberich v. Jack*, 392 S.C. 278, 287, 709 S.E.2d 607, 612 (2011) (quoting *Rogers* ). "It is this present consciousness of wrongdoing that justifies the assessment of punitive damages against the tort-feasor...." *Rogers*, 233 S.C. at 578, 106 S.E.2d at 263. In other words, "at the time of his act or omission to act the tort-feasor [must] be conscious, or chargeable with consciousness, of his wrongdoing." *Id.* at 578, 106 S.E.2d at 264.

We find the trial court properly denied BOA's motion for JNOV on punitive damages. Here, Yourko received training as a personal banker in Charlotte, North Carolina on three separate occasions for one week at a time. Yourko explained she was trained to employ the policies and procedures outlined in BOA's Platform Manual. Yourko also received on-the-job training in BOA's policies and procedures from the personal banker she replaced. Lawrence received six months training as branch manager. This training included working as a teller, personal banker, and training in a banking center manager role. Lawrence explained each BOA branch had a Platform Manual available for its employees. BOA also had a computer system that provided prompts based upon the Platform Manual for its employees to use in conducting business. Furthermore, BOA employees had access to a helpline to assist with issues regarding BOA's policies and procedures.

BOA's Platform Manual defines a conservator as a "[c]ourt-appointed individual who: [c]ares for and/or manages the property and affairs of a minor or an incapacitated (physically or mentally) adult" and notes a conservator may also be referred to as a guardian or curator. A conservatorship account is defined as one "[e]stablished by a court-appointed guardian, conservator, or curator to manage the funds of a ward." The definitions of guardian, conservator, and curator and guardianship account, conservatorship account, and a curatorship are substantively similar. Opening a conservatorship account requires an original or certified copy of the court order appointing the conservator that contains the name of the conservator, the name of the ward, a signature of a court official, a certified seal or filing stamp, and a statement indicating the conservator is guardian over the estate or property of the ward. If the court order indicates an order of the court is required for withdrawals, "Court Restricted Account" must be included in the title of the account. When a court order contains restrictions, the personal banker is required to contact BOA Banking Group Support–Legal Support.

When a customer presents a check including a payee designation with a title such as guardian, conservator, or curator, BOA's Teller Operations Manual requires that the payee's authority be verified before the check is cashed. The endorsement must also include the payee's title. The Teller Operations Manual and the Platform Manual both include the warning that "When negotiating items, the best way to avoid fraud or a loss situation is to 'KNOW YOUR ENDORSER.'" Based on their training and experience, we find Yourko and Lawrence are chargeable with knowledge of BOA's policies and procedures for establishing a court restricted conservatorship account and negotiating checks.

The court order appointing Unrue and Travis Powell as co-conservators required Cody's funds to be deposited in a restricted account that required a court order for withdrawals. Unrue received eight checks from two insurance companies on behalf of Cody. Unrue presented seven checks to Yourko. Two checks designated "Karen and Travis Powell, *Co–Cn* For Minor Cody P." as the payee. (emphasis added). One check designated "T. Powell & K. Powell *Co–Conservators* For Cody

P., A Minor" as payee. (emphasis added). Four checks designated "Karen Powell, As *Conservator* Of Cody P. A Minor" as payee. (emphasis added). Despite the payee designations, Yourko opened a CD account titled "Karen M. Unrue Guardian [Cody]" without requesting an original or certified copy of the court order appointing Unrue as conservator. Assuming Yourko misunderstood the conservator title on the checks, the Platform Manual provides that a guardian is a court appointed individual who cares for and manages the property of a minor or incapacitated adult. Further, establishing a guardianship account also required Yourko to request an original or certified copy of the court order appointing Unrue.

Unrue also presented one check to Lawrence that listed the payee as "Karen M. Powell, As *Conservator* For Cody P. A Minor." (emphasis added). Lawrence opened a Uniform Gift to Minors Act savings account titled "Karen M. Unrue—cust [Cody] UMGA [sic]" also without requesting an original or certified copy of the court order appointing Unrue as conservator.

Denning, BOA's designated representative, testified the payee designations were clear: "They were made out to conservators. There's nothing that was misconstrued here. It's obvious who they were made out to." Denning also explained the payee designation on the checks indicated the existence of a court order: "[F]rom the beginning she had the checks and on the checks it told her who the conservator was and the minor. It stated that on the checks. When she got ready to open the account, these were court ordered. There were other documents that she needed to see." Furthermore, BOA's designated representative Reeves explained Yourko and Lawrence should have requested the court order when presented with checks payable to a payee with the title conservator. Finally, Hubbs, Powell's expert in banking and banking operations, explained the conservator payee designation should have alerted Yourko and Lawrence to the existence of court documents that BOA's policies and procedures required to open the accounts and negotiate the checks.

We find the evidence presented at trial was sufficient to warrant submitting the punitive damages issue to the jury. Considering the evidence in a light most favorable to Powell, a

person of ordinary reason and prudence in Yourko's and Lawrence's position would have known he or she was opening the accounts without the safeguards mandated by the court order and in contravention to BOA's policies and procedures. Accordingly, the trial court properly denied BOA's motion for JNOV on this ground.[4]

## B. *Mitchell v. Fortis* Analysis

Because the jury found Unrue's conduct was reasonably foreseeable in light of the attendant circumstances and Powell proved BOA's conduct was willful, wanton or reckless by clear and convincing evidence, we must determine whether the jury's award of punitive damages was constitutionally proper using the test articulated by our supreme court in *Mitchell v. Fortis Insurance Co.*, 385 S.C. 570, 686 S.E.2d 176 (2009). Applying the *Mitchell* test, we conclude that it is.

"Because punitive damages are quasi-criminal in nature, the process of assessing punitive damages is subject to the protections of the Due Process Clause of the Fourteenth Amendment of the United States Constitution." *James v. Horace Mann Ins. Co.*, 371 S.C. 187, 194, 638 S.E.2d 667, 670 (2006). The trial court must review

the constitutionality of a punitive damages award by determining whether the award was reasonable under the following guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual and potential harm suffered by the plaintiff and the amount of the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

---

4. BOA submits if we find Powell proved punitive damages by clear and convincing evidence, we should not find it liable for punitive damages under the facts of this case because it lacked complicity with the actions of its employees. In short, BOA asks us to adopt the complicity doctrine set forth in the Restatement (Second) of Torts § 909 (1965). We find this issue is unpreserved for our review because BOA failed to raise it in its motion for a directed verdict on punitive damages *In re McCracken*, 346 S.C. 87, 92–93, 551 S.E.2d 235, 238 (2001) (finding only grounds raised in a directed verdict motion can be raised in a JNOV motion).

*Austin v. Stokes–Craven Holding Corp.,* 387 S.C. 22, 52, 691 S.E.2d 135, 151 (2010) (citing *Mitchell,* 385 S.C. at 587–88, 686 S.E.2d at 185–86). This court conducts a de novo review in evaluating the constitutionality of a punitive damages award. *Mitchell,* 385 S.C. at 583, 686 S.E.2d at 183.

First, in examining the reprehensibility of defendant's conduct, we "should consider whether: (i) the harm caused was physical as opposed to economic; (ii) the tortious conduct evinced an indifference to or a reckless disregard for the health or safety of others; (iii) the target of the conduct had financial vulnerability; (iv) the conduct involved repeated actions or was an isolated incident; and (v) the harm was the result of intentional malice, trickery, or deceit, rather than mere accident." *Id.* at 587, 686 S.E.2d at 185. Considering these factors, we find BOA's conduct evinces a high degree of reprehensibility. Although, the harm Cody suffered was economic and not physical, the evidence established Cody was financially vulnerable. The misappropriated funds were life insurance proceeds meant to compensate Cody for the loss of his father's support. Based upon Yourko's admission she knew Unrue was helping take care of Cody after his father was killed and the conservator designation on the payee line of the checks, BOA was aware of Cody's financial vulnerability. Furthermore, Cody is a special needs child who suffers from seizures and uses the funds to pay for medical expenses, school supplies, and necessities.

Despite Cody's financial vulnerability and BOA's awareness thereof, it failed to set up Cody's accounts with the proper safeguards to protect his funds. While BOA's conduct did not evince an indifference to or a reckless disregard for Cody's health or safety, it exposed Cody to the possibility he might not be able to afford his medical expenses. Although the harm Cody suffered was not the result of intentional malice, trickery, or deceit on BOA's part, we are surprised by the ease with which Unrue was able to circumvent BOA's safeguards and defeat the mandate of the court order requiring her to deposit Cody's funds in a restricted account. BOA blindly followed Unrue's request to open a CD and a UGMA account when presented with checks indicating the existence of court process and triggering its obligation to request a copy of the court order appointing Unrue. We are also surprised

by BOA's failure to recognize the significance of the conservator designation on the payee line of the checks. For instance, both Yourko and Lawrence failed to recognize the significance of the conservator designation despite their training in BOA's policies and procedures. Neither requested a copy of the court order appointing Unrue. When Yourko handed the checks to the teller to process, the teller failed to verify Unrue's authority before cashing the checks. The teller also failed to require Unrue to endorse the checks with her title. Furthermore, per BOA's Platform Manual a CD is not an eligible product for a conservatorship or guardianship account. BOA's "operations area" that reviews the activity of the tellers and personal bankers for compliance with BOA's safeguards failed to catch the discrepancy between the conservator designation on the payee line of the checks and CD account Yourko opened. The operations area also allowed the checks to be negotiated without the proper endorsements. BOA's conduct involved repeated failures to employ the safeguards prescribed to protect Cody's funds. Accordingly, we conclude BOA's conduct was sufficiently reprehensible to support a punitive damages award.

Next, we examine the ratio between actual and punitive damages. *Id.* at 587–88, 686 S.E.2d at 185. While there is no concrete constitutional limit on the ratio between actual and punitive damages, "few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy due process." *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 410, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). In determining the reasonableness of the ratio we may consider (1) the likelihood that the award will deter the defendant from like conduct; (2) whether the award is reasonably related to the harm likely to result from such conduct; and (3) the defendant's ability to pay. *Mitchell,* 385 S.C. at 588, 686 S.E.2d at 185. In short, this court "must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Campbell,* 538 U.S. at 426, 123 S.Ct. 1513.

Here, the ratio of punitive to actual damages is 7.69 to 1, at the high end of the single-digit spectrum. However, it is probable that a $1.5 million punitive damages award will deter

BOA from like conduct and encourage BOA to better train its employees and implement more effective safeguards to protect customer's funds. Furthermore, BOA has the ability to pay the punitive damage award. The net worth of its shareholder equity as of June 30, 2008, four months before trial, was $163 billion.

Furthermore, the award should be reasonably related to the harm likely to result from BOA's conduct. Here, the evidence established that correctly setting up a conservator account takes approximately one hour. Powell introduced evidence of BOA's weekly, daily, and hourly earnings. For instance, Dr. Wood, Powell's expert economist, testified BOA earned approximately $258 million per week, $36.9 million per day, and $1,538,250 per hour. During closing argument, Powell asked the jury to punish BOA for the harm caused by BOA's failure to properly protect Cody's funds by awarding punitive damages in the amount BOA earns in one hour—the amount of time it would have taken to set up Cody's accounts with the appropriate safeguards. Powell also argued a $1,538,250 award would send a message to BOA that it needed to ensure the appropriate safeguards are employed to protect their customers' funds. The jury awarded Powell 1,583,000 in punitive damages. The consistency between BOA's one hour earnings figure and the jury's punitive damages award leads us to the conclusion that the punitive damages award is reasonably related to the harm Cody suffered as a result of BOA's failure to set up his accounts with the appropriate safeguards.

We are mindful that our supreme court recently questioned the "propriety of extrapolating financial data" regarding a defendant's per week, per day, and per hour income, revenue, and cash flow for determining a defendant's ability to pay. *Branham v. Ford Motor Co.,* 390 S.C. 203, 239–40, 701 S.E.2d 5, 24–25 (2010). In *Branham,* the plaintiff introduced extrapolated per week, per day, and per hour figures of Ford's net worth, income, revenues, and cash flow. *Id.* at 239, 701 S.E.2d at 24. The *Branham* court noted this court has found no abuse of discretion in the admission of per day earnings, operating revenue, and net income. *Id.* at 240, 701 S.E.2d at 24; *Bryant v. Waste Mgmt., Inc.,* 342 S.C. 159, 170, 536 S.E.2d 380, 386 (Ct.App.2000) (finding the trial court properly

admitted evidence of the defendant's per day operating revenue and net income); *Orangeburg Sausage Co. v. Cincinnati Ins. Co.*, 316 S.C. 331, 344, 450 S.E.2d 66, 74 (Ct.App.1994) (finding the trial court did not abuse its discretion in admitting evidence of the defendant's per day earnings). However, although the court questioned whether *Bryant* and *Orangeburg Sausage* would pass constitutional muster after *Campbell*, it did not overrule either case. *Branham*, 390 S.C. at 239–40, 701 S.E.2d at 24–25. In light of the foregoing, we rely on such evidence here only in finding the jury's award of punitive damages was reasonably related to the harm Cody suffered.

Finally, we consider "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Mitchell*, 385 S.C. at 588–89, 686 S.E.2d at 186. No authorized civil penalties are applicable here. An examination of cases with punitive to actual damages ratios at the high end of the single-digit spectrum reveals conduct by the defendant that is highly reprehensible. *See, e.g., Austin*, 387 S.C. at 55, 691 S.E.2d at 152 (upholding a punitive to actual damage ratio of 8.21 to 1 when defendant's misrepresentations regarding the physical condition of the vehicle purchased by the plaintiff evinced a reckless disregard for the health and safety of the plaintiff and the general public); *Mitchell*, 385 S.C. at 594, 686 S.E.2d at 188 (finding an punitive to actual damage ratio of 9.2 to 1 satisfied due process, even though plaintiff's harm was economic, because defendant's actions exposed plaintiff to great risk of physical danger); *James*, 371 S.C. at 197, 638 S.E.2d at 672 (upholding a punitive to actual damage ratio of 6.82 to 1 when defendant's insurance adjuster made repeated false representations that led to the denial of plaintiff's insurance claim and plaintiff being sued by a third party who was bitten by plaintiff's dog); *Collins Entm't Corp. v. Coats & Coats Rental Amusement*, 355 S.C. 125, 143, 584 S.E.2d 120, 130 (Ct.App. 2003) (finding a 9.9 to 1 punitive to actual damage ratio was proper based upon defendant's tortious interference with contract); *Lister v. NationsBank of Del., N.A.*, 329 S.C. 133, 152–53, 494 S.E.2d 449, 460 (Ct.App.1997) (finding a 23 to 1 punitive to actual damages ratio was proper when the defendant's licensee made an unauthorized charge of $7,696.63 on

plaintiff's credit card). We find BOA's conduct here is equally reprehensible to the conduct in the above cited cases and conclude the jury's award of punitive damages is in accord with punitive damage awards in comparable cases.

In short, BOA's failure to protect Cody's funds with the proper safeguards was highly reprehensible. Although the ratio between actual and punitive damages is at the high end of the single-digit spectrum, a review of comparable cases reveals conduct of a similar degree of reprehensibility to BOA's conduct here. The award is reasonable and proportionate to the harm Cody suffered and the general damages recovered. Finally, BOA has the ability to pay the punitive damage award, which represents less than one percent of its net worth. Based on our review of the guideposts outlined in *Mitchell*, we conclude the punitive damages award is constitutionally proper.

## CONCLUSION

For the foregoing reasons, the decision of the trial court is **AFFIRMED.**

HUFF and KONDUROS, JJ., concur.