778 S.E.2d 493

**FIRST SOUTH BANK, Respondent,**

v.

**SOUTH CAUSEWAY, LLC, Appellant.**

**Appellate Case No. 2012–213524**
**No. 5357.**

Court of Appeals of South Carolina.

Heard Oct. 14, 2014.

Decided Oct. 21, 2015.

436

438

James Mixon Griffin, of Lewis Babcock & Griffin, LLP, of Columbia, for appellant.

Joel W. Collins Jr. and Christian Stegmaier, both of Collins & Lacy, PC, of Columbia, for respondent.

McDONALD, J.

South Causeway, LLC (South Causeway) appeals in this commercial foreclosure action, arguing the circuit court erred by (1) directing a verdict in favor of First South Bank on South Causeway's claim for tortious interference with a prospective contract; (2) refusing to admit certain email correspondence; and (3) denying South Causeway's motion for judgment notwithstanding the verdict, or in the alternative, a new trial on its breach of contract counterclaim. We affirm.

**FACTS/PROCEDURAL BACKGROUND**

In October 2005, Peggy Wheeler–Cribb and Will Darwin Wheeler (collectively, the Wheelers) executed a promissory note in favor of First Palmetto Savings Bank (Palmetto) in the amount of $4,500,000. The note was secured by mortgages on two properties: (1) 17.49 acres [1] of undeveloped commercial property in Pawleys Island owned by Wheeler–Cribb; and (2) certain residential property in Pawleys Island owned by Wheeler. In April of 2006, Wheeler–Cribb acquired an additional 1.68 acres [2] abutting the 17.49 acre commercial tract, resulting in a total of 19.17 acres (19.17 acre tract). On January 25, 2007, Palmetto modified the note's maturity date—extending it from October 15, 2007, to October 15, 2008—and released its mortgage on the residential property owned by Wheeler.

---

1. Wheeler–Cribb purchased the 17.49 acre tract of land for $5,800,000; it was appraised at $6,000,000.

2. Wheeler–Cribb purchased the 1.68 acre tract of land for $1,200,000. It was appraised at $800,000, and was the last parcel needed to control the entire 19.17 acres.

Through their dealings with Palmetto, the Wheelers met and worked with F. Wayne Lovelace, a vice president at Palmetto. Lovelace subsequently left Palmetto and joined First South Bank (FSB) as its senior vice president. In September 2007, Lovelace contacted the Wheelers about moving their loan from Palmetto to FSB. On June 25, 2008, FSB made a $6,500,000 commercial acquisition and development loan to South Causeway.[3] This loan was secured by the 19.17 acre tract.[4]

Pursuant to the loan agreement (Agreement), FSB was to lend South Causeway up to $6,500,000 in separate advancements. At the closing, FSB advanced South Causeway $4,769,725.23, satisfying both the outstanding loan from Palmetto and an outstanding loan from FSB secured by Lot 4 at 334 Myrtle Avenue in Pawleys Island. (Lot 4).[5] According to the "unexhausted terms" of FSB's commitment letter (Commitment)[6] dated May 30, 2008, FSB was to deposit $850,000 into a restricted access demand deposit account to fund closing costs and monthly interest payments until the property was either developed or sold. At the closing, FSB deposited $300,000 into the account. Under the Commitment, the remaining $550,000 was to be disbursed "upon the earlier to occur of completion of the Infrastructure and six (6) months from the date of loan closing." However, FSB never deposited the remaining $550,000 into the restricted access demand deposit account.

Under the terms of the Agreement, "Advances subsequent to the Initial Advance shall be made . . . as construction of the

---

3. South Causeway, LLC was organized in May of 2008, and thereafter, in exchange for her membership interest, Wheeler–Cribb deeded the 19.17 acres of undeveloped commercial property to South Causeway.

4. The note was secured by a June 25, 2008 mortgage on real property, recorded in the office of the Register of Deeds for Georgetown County in Mortgage Book 990 at page 247.

5. Lot 4 was encumbered by a prior $550,000 loan from FSB at the time of the loan closing. Wheeler–Cribb pledged Lot 4 as additional collateral to secure the South Causeway loan with FSB.

6. The Commitment and the Agreement both provide that the Agreement shall control in the event of any conflict or inconsistency.

Improvements [7] progresses.... After the Initial Advance[,] Advances shall be based upon percentage of completion of the Improvements, subject, in each case, however, to the provisions of this Article IV."

Section 4.2 stated the conditions precedent for each subsequent advance including: an executed construction contract assignment, no event of default, and a request for advance. Section 4.6(4) of the Agreement provided that FSB "shall have no obligation to lend if at the time of any requested advance there shall have occurred an event of default hereunder."

Section 7.1 articulated numerous events constituting default, including the borrower's abandonment of "construction of the improvements with the intent not to resume construction for a period of 5 consecutive days." Section 7.2 outlined FSB's remedies upon the occurrence and continuation of an event of default:

Bank may (i) terminate all obligations of Bank to Borrower, including without limitation, all obligations to lend money under this agreement, (ii) declare immediately due and payable ... the note and any other note or obligation of Borrower held by Bank ... and (iii) pursue any remedy available to it under the note, under any security agreement, under any other note of Borrower held by Bank, or available at law or in equity.

Bank shall have the further right ... to enter into and take possession of the Mortgaged Property....

On June 30, 2008, Lincoln Harris Properties, LLC (LHP) entered into a letter of intent with South Causeway to purchase the 19.17 acre tract for $12,000,000. On July 2, 2008, Wheeler–Cribb informed FSB of LHP's interest in the undeveloped commercial property and the letter of intent. Later that day, Wheeler–Cribb sent the following email to FSB: "Information only. We would not be interested in those terms."

In a September 30, 2008 email, Wheeler–Cribb informed FSB that due to the downturn in the economy, South Cause-

---

7. Improvements are defined as "roads, drives, parking areas, exterior free-standing lighting and utilities (and installation thereof) and other infrastructure improvements for and to service the retail shopping areas."

way had decided to sell the 19.17 acre tract. Wheeler–Cribb went on to say, "If you want or need to do away with the construction part of the loan that is fine ... [If] we aren't complying [with the terms of the Agreement] we would appreciate knowing so we can [comply]." Following this email, FSB made no additional advances to South Causeway.

South Causeway attempted to negotiate a lease agreement with Lowe's Food through October 2008, but Lowe's Food terminated negotiations. Shortly thereafter, South Causeway sought a real estate broker to market the 19.17 acre tract. In November 2008, Wheeler–Cribb approached FSB about making a loan on another piece of property. At this time, FSB suggested South Causeway seek financing from a local lender.[8]

On April 10, 2009, South Causeway and FSB entered into an amended agreement that shortened the maturity date by one year and released Lot 4.[9] In the presence of counsel, Wheeler–Cribb executed the agreement, which included a release that forever discharged FSB from any claims South Causeway "ever had, now has or ... may have ... by reason of any matter ... from the beginning of the world" through the execution of the loan. During this period, South Causeway received and rejected two offers to purchase the 19.17 acre tract.

In March 2010, Harris Investment Company # 1, LLC (HIC), a subsidiary of LHP, approached FSB regarding a potential purchase of South Causeway's note and mortgage. After HIC and FSB entered into a confidentiality agreement, HIC reviewed South Causeway's primary loan documents, which included the Agreement, note, title insurance, and appraisal. Ultimately, FSB declined HIC's offer to purchase the South Causeway loan.

On April 12, 2010, South Causeway retained Vintage Estates Realty (VER) to sell the undeveloped commercial property at auction. At trial, Wheeler–Cribb testified they

---

8. South Causeway subsequently secured additional financing from Kennedy Funding (KF), which acquired a primary security interest in Lot 4.

9. South Causeway's bridge loan from KF closed the same day. Pursuant to the above-referenced loan agreement, a portion of the proceeds from the KF loan were transferred to FSB.

"planned to try to auction [the 19.17 acre tract,] and if that did not work[,] we would divide it into [four] lots."[10] On May 15, 2010, Lovelace informed Don Thomas—formerly the broker in charge at VER—that FSB "would not accept anything less than the amount owed on the property" and "would not be willing to release a portion of the property to a buyer." Lovelace also informed Thomas of the amount due on the loan and that FSB did not plan to renew the loan. At trial, Thomas testified he believed these disclosures by Lovelace to be confidential: "I guess I was surprised to hear the information." He was asked:

Q: Has a mortgage company or a bank officer ever called you directly and disclosed this type of information?

. . . .

A: Well, not in the sense where it was a call out of the blue. If a client had contacted their mortgage lender and allowed [it] ... or had signed a document ahead of time saying I was allowed to hear this information on behalf of the client that would be a different scenario.

As a result of the conversation between Thomas and Lovelace, VER changed the minimum sale price of each lot to $4,800,000, for a total sale price of $19,200,000. The auction went forward on June 1, 2010. At trial, Thomas testified they "offered the first parcel, being the entire [19.17 acre tract], and when we did not get any bids on that, then we went down to each parcel individually."

On July 2, 2010, LHP made a second offer to purchase the 19.17 acre tract from South Causeway for $4,000,000. South Causeway rejected this offer. South Causeway was unable to satisfy its financial obligations to FSB on the loan's maturity date, July 5, 2010. On August 5, 2010, FSB initiated a foreclosure action.

The Honorable Thomas A. Russo heard the case on September 18–25, 2012. Judge Russo bifurcated the trial, first presenting South Causeway's counterclaims to the jury and then ruling on the foreclosure action after discharging the jury. Following FSB's case, South Causeway moved for a directed

10. The 19.17 acre tract was originally listed for $7 million with a $4.8 million reserve. The four lots were originally listed for $1.4 million, $1.5 million, $2.5 million, and $1.1 million, totaling $6.5 million.

verdict as to FSB's foreclosure cause of action, arguing FSB failed to establish the amount of the debt. The circuit court denied this motion. At the conclusion of South Causeway's case, the circuit court directed a verdict in favor of FSB on the following South Causeway counterclaims: (1) breach of contract accompanied by fraudulent act, (2) fraud, (3) breach of fiduciary duty, (4) negligent misrepresentation, and (5) tortious interference with a prospective contract. On September 25, 2012, the jury returned a verdict in favor of FSB on South Causeway's remaining counterclaims: (1) breach of contract, (2) tortious interference with contract, and (3) violation of the South Carolina Unfair Trade Practices Act (SCUTPA).[11] Thereafter, the court entered judgment against South Causeway on the foreclosure action. On November 2, 2012, the circuit court denied South Causeway's post-trial motions and entered a supplemental judgment of foreclosure in the amount of $5,694,334.89. This appeal followed.

**ISSUES**

I. Did the circuit court err in directing a verdict in favor of FSB as to South Causeway's counterclaim for tortious interference with a prospective contract?

II. Did the circuit court err in refusing to admit email correspondence on the basis of hearsay?

III. Did the circuit court err in denying South Causeway's motion for judgment notwithstanding the verdict, or in the alternative, motion for a new trial on its claims for breach of contract?

**LAW/ANALYSIS**

**I. Tortious Interference with a Prospective Contract**

■ South Causeway argues the circuit court erred in directing a verdict in favor of FSB on South Causeway's counterclaim for tortious interference with a prospective contract. We disagree.

■ When reviewing the trial court's ruling on a motion for a directed verdict, this court must apply the same standard as the trial court by viewing the evidence and all reasonable inferences in the light most favorable to the nonmoving party.

---

11. S.C.Code Ann. §§ 39–5–10 through –180 (1985 & Supp.2014).

*Elam v. S.C. Dep't of Transp.*, 361 S.C. 9, 27–28, 602 S.E.2d 772, 782 (2004). The trial court must deny a motion for a directed verdict if the evidence yields more than one reasonable inference or its inference is in doubt. *Strange v. S.C. Dep't of Highways & Pub. Transp.*, 314 S.C. 427, 429, 445 S.E.2d 439, 440 (1994). In considering a motion for directed verdict, neither the trial court nor the appellate court has the authority to decide credibility issues or to resolve conflicts in the testimony or the evidence. *Welch v. Epstein*, 342 S.C. 279, 300, 536 S.E.2d 408, 419 (Ct.App.2000).

After the conclusion of South Causeway's case, FSB moved for a directed verdict on numerous grounds, including South Causeway's counterclaim for tortious interference with a prospective contract. FSB argued that "the only evidence ... [presented] at all is that the auction got no bids. We haven't heard about any prospective contract." According to South Causeway, Thomas testified "he used his professional judgment and skill in setting the reserve prices[,] and as a result of Mr. Lovelace's directions[,] they were changed."

The circuit court directed a verdict in favor of FSB, noting that FSB was "justified in disclosing the information, as [VER] needed [it] ... to effectively conduct the auction." South Causeway immediately moved for reconsideration, arguing FSB interfered with South Causeway's contract with the auction company and that "prior to the auction there was a reasonable certainty that ... a contract [would be] made as a result of the auction." The circuit court denied South Causeway's motion to reconsider.

■ "To establish a cause of action for intentional interference with prospective contractual relations, a plaintiff must show: 1) intentional interference with prospective contractual relations; 2) for an improper purpose or by improper methods; and 3) resulting in injury." *Eldeco, Inc. v. Charleston Cty. Sch. Dist.*, 372 S.C. 470, 480, 642 S.E.2d 726, 731 (2007). "Generally, there can be no finding of intentional interference with prospective contractual relations if there is no evidence to suggest any purpose or motive by the defendant other than the proper pursuit of its own contractual rights with a third party." *Eldeco*, 372 S.C. at 482, 642 S.E.2d at 732 (quoting *S.*

*Contracting, Inc. v. H.C. Brown Constr. Co.*, 317 S.C. 95, 102, 450 S.E.2d 602, 606 (Ct.App.1994)).

William Barksdale (Barksdale) testified for South Causeway as an expert in commercial banking, commercial lending policies and procedures, and banking policies and procedures. With respect to the Lovelace disclosure, Barksdale opined that

banks shouldn't release private confidential information to a third party unless there is a reason to do so pursuant to a court order or the borrower wants you to give information to someone who is doing due diligence on something they are doing, they have given the bank as a reference. You don't release confidential information.

Barksdale further testified that the amount owing on a note, a loan's maturity date, and a bank's decision whether to renew a loan would be confidential information. He admitted on cross-examination, however, that FSB's disclosure did not violate any code of ethics, banking standard, or privacy law and that FSB was under no obligation to renew the loan once it had legally matured.

■ To satisfy the first element of the cause of action for tortious interference with prospective contractual relations, South Carolina law requires that a "plaintiff must demonstrate that he had a truly prospective or potential contract with a third party; that the agreement was a close certainty; and that the contract was not speculative." *Santoro v. Schulthess*, 384 S.C. 250, 263, 681 S.E.2d 897, 904 (Ct.App.2009). South Causeway cannot satisfy this requirement.

Although Wheeler–Cribb sought to establish that the Lovelace disclosure caused LHP to reduce its purchase offer from the $12,000,000 offered in 2008, to the $4,000,000 offered in 2010, the record, particularly Wheeler–Cribb's outright rejection of the terms of the 2008 $12,000,000 offer and the subsequent unforeseen downturn in the commercial real estate market, simply does not support this assertion. The record further reflects that South Causeway called no witnesses to testify as to any other existing prospective contract, nor did it present testimony from potential auction bidders or prospective purchasers who were deterred by the disclosure.

In addition, South Causeway cannot demonstrate that the Lovelace disclosure was made for an improper purpose or by

any improper method. Barksdale's testimony established that all parties should have been forthcoming about the loan's maturity and FSB's right to refuse to release any portion of the collateral for an amount that would not cover the debt. VER did not disclose the information to anyone outside the company, and the information would have been necessary for a successful sale of the property. FSB asked Barksdale the following:

Q. . . . Didn't you tell us at your deposition that Miss Cribb should have told the auction company about the amount of her loan and the notice that she had already received that the bank was not interested in renewing the loan and that they would not accept partial release, they would not give partial releases?

A. Well, I think I have testified also that in that situation all the parties should have been forthcoming about the auction so that they all would be cooperating.

Q. Mr. Barksdale, didn't you tell us under oath at your deposition that the bank had told her the exact circumstances, that no extension of the maturity date would be given and no partial releases would be given, and I asked you is that something Miss Cribb really needed to tell the auction company before they proceeded with that auction, and you said, "Well, everybody should have known what's going on"?

A. Yes, that is what I just said.

Q. Okay. And that everybody includes the auction company, doesn't it?

A. Yes, sir.

Lovelace provided VER with information necessary to protect FSB's contractual rights under the loan documents, and no sale of the separate parcels could have occurred without the information concerning FSB's interest in the tract. Thus, South Causeway cannot establish the "improper purpose or improper method" necessary to support a cause of action for interference with prospective contractual relations. *See, e.g., Eldeco,* 372 S.C. at 482, 642 S.E.2d at 732 (upholding directed verdict where defendant acted in pursuit of its own contractual rights).

Consequently, we conclude the circuit court properly granted FSB's motion for a directed verdict on South Causeway's counterclaim for tortious interference with a prospective contract. *See Law v. S.C. Dep't of Corr.*, 368 S.C. 424, 434–35, 629 S.E.2d 642, 648 (2006) (explaining that an appellate court will reverse the circuit court's ruling on a directed verdict motion only "when there is no evidence to support the ruling or where the ruling is controlled by an error of law.").

## II. Hearsay

■ South Causeway contends the circuit court erred in sustaining hearsay objections as to certain email correspondence when the documents at issue were offered to prove notice and motive, rather than the truth of the matter asserted.[12] South Causeway further argues the circuit court erred in refusing to admit the email correspondence under the business records exception to the hearsay rule. We disagree.

■ "The admission of evidence is within the [circuit] court's discretion." *R & G Constr., Inc. v. Lowcountry Reg'l Transp. Auth.*, 343 S.C. 424, 439, 540 S.E.2d 113, 121 (Ct.App. 2000). "The court's ruling to admit or exclude evidence will only be reversed if it constitutes an abuse of discretion amounting to an error of law." *Id.; see also Gamble v. Int'l Paper Realty Corp. of S.C.*, 323 S.C. 367, 373, 474 S.E.2d 438, 441 (1996) (noting a ruling on the admission or exclusion of evidence will not be disturbed on appeal absent a clear abuse of discretion).

### A. Notice

■ South Causeway attempted to introduce into evidence a series of emails between Greg Currie of LHP and Chip

---

12. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" and is inadmissible unless it falls under one of the enumerated exceptions. Rules 801(c) and 802, SCRE. Conversely, a statement that is not offered to prove the truth of the matter asserted should not be excluded as hearsay. *See Hawkins v. Pathology Assocs.*, 330 S.C. 92, 107–08, 498 S.E.2d 395, 403–04 (Ct. App.1998) (allowing admission of letters, an anniversary card, and a video to show close familial bond between decedent, her husband, and her children in a medical malpractice action).

Lyerly of FSB, in which LHP expressed interest in purchasing the 19.17 acre tract. South Causeway contended that the only reason it sought to introduce a March 27, 2010 email was to establish notice on the part of Lyerly as to the contents of the email. FSB objected, arguing the email was hearsay.

> South Causeway: In any event, it just says, "We're comfortable in getting interest payments over the next four months." Your Honor, that establishes that before the confidentiality agreement was even executed [FSB] had disclosed to these folks ...
>
> Court: Okay. You just admitted to me that you are putting this in for ... the truth of the matter asserted.
>
> South Causeway: Well, perhaps as to that part.
>
> Court: Well, it is hearsay, so [the March 27, 2010 email is] not coming in.

At trial, South Causeway acknowledged that it sought to introduce the March 27, 2010 email—at least in part—for the truth of the matter asserted. Although South Causeway contends on appeal that it did not admit that the emails were being offered for the truth of the matter asserted, South Causeway acknowledges "counsel conceded during argument that the emails could be considered for the truth of the matter asserted for a very limited purpose." Thus, we find South Causeway's argument regarding the March 27, 2010 email is not properly before this court. *See Austin v. Stokes–Craven Holding Corp.*, 387 S.C. 22, 46, 691 S.E.2d 135, 147 (2010); *see also TNS Mills, Inc. v. S.C. Dep't of Revenue*, 331 S.C. 611, 617, 503 S.E.2d 471, 474 (1998) ("An issue conceded in a lower court may not be argued on appeal.").

## B. Motive

■ South Causeway also sought to admit a May 24, 2010 email, arguing it showed Lyerly was on notice that LHP breached its confidentiality agreement by meeting with county officials regarding the 19.17 acre tract, and that FSB had motive to contact VER on May 15, 2010, about the upcoming auction. The circuit court ruled the May 24, 2010 email inadmissible, cogently noting "this doesn't have any effect on the hearer when it occurs nine days after the hearer already acted."

The May 24, 2010 email from Currie to Lyerly included the following information:

After our initial visit, we reviewed the county approved site plan and development plan internally and with our engineering firm. We had non-binding meetings with county officials who understood our concerns and how the site was "loaded" and we got feedback that suggested our changes would be supported.... [Lyerly], I am sorry we could not hit your expectations in timing. We were moving as quickly as possible. This is a unique piece of property that is somewhat "shop worn" among retailers. The pending auction did not help matters either. We are in a very different economic environment than we were even a year ago. We remain very interested in the property, but we respect the bank's position.

We find it factually impossible that the May 24, 2010 email from LHP to FSB provided FSB with a motive for contacting VER on May 15, 2010. Thus, the circuit court did not abuse its discretion in excluding the May 24, 2010 email correspondence, and we affirm the hearsay rulings.

## C. Business Records Exception

South Causeway argues the series of emails was admissible under the business records exception to the hearsay rule found in Rule 803(6), SCRE.[13] According to South Causeway, "[t]he emails were produced in discovery, came from their computer systems[,] and were maintained by First South in the ordinary course of business." The record reveals, however, that South Causeway did not raise the business records exception as a basis for admissibility to the trial court. Thus, we find this issue is unpreserved. *See Gause v. Smithers,* 403 S.C. 140, 151, 742 S.E.2d 644, 650 (2013) (stating an issue cannot be raised for the first time on appeal); *Wilder Corp. v. Wilke,* 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) (noting the first step in preserving an issue for appellate review is to raise it to the lower court).

---

13. Under the business records exception to the hearsay rule, a memorandum, report, record, or data compilation, in any form, of acts, events, conditions, or diagnoses may be admissible if it is (1) made at or near the time of the event recorded; (2) prepared by someone with knowledge; (3) made and kept in the course of a regularly-conducted business activity; (4) identified by the custodian or a qualified witness who can testify regarding the mode of preparation of the record; and (5) found to be trustworthy by the court. *See* Rule 803(6), SCRE; *High v. High,* 389 S.C. 226, 239, 697 S.E.2d 690, 696–97 (Ct.App.2010).

### III. Motion for JNOV, or in the alternative, Motion for a New Trial

South Causeway contends the circuit court erred in denying its motion for judgment notwithstanding the verdict on its breach of contract counterclaim. In the alternative, South Causeway argues the circuit court erred in denying its motion for a new trial pursuant to the thirteenth juror doctrine. South Causeway bases these arguments on the following language from subsection F of the Commitment: "An additional $550,000.00 of the proceeds of the Loan shall be disbursed by Bank into the Account to fund monthly interest payments due upon the Loan upon the earlier to occur of completion of the Infrastructure and six (6) months from the date of Loan closing." South Causeway asserts that this subsection "clearly requires that only one of the two conditions had to occur before the interest reserve funds were due for deposit."

"A motion for judgment notwithstanding the verdict under Rule 50(b), SCRCP is a renewal of a directed verdict motion." *Wright v. Craft,* 372 S.C. 1, 20, 640 S.E.2d 486, 496 (Ct.App.2006). "A motion for JNOV may be granted only if no reasonable jury could have reached the challenged verdict." *Gastineau v. Murphy,* 331 S.C. 565, 568, 503 S.E.2d 712, 713 (1998).

The circuit court found that the admitted exhibits and witness testimony supported the following findings: South Causeway did not meet the conditions precedent for subsequent advances as required by the Agreement; South Causeway abandoned its plan to develop the property, constituting an event of default under the Agreement; and therefore, FSB did not have a duty to make the subsequent advance of $550,000 into the interest reserve account. Moreover, the $550,000 advance referenced in the Commitment was not part of the Agreement, which provided that "the terms, conditions[,] and provisions of the Commitment are incorporated herein and made a part hereof by reference. To the extent that any specific inconsistencies exist between the Commitment, and this Agreement, ... the provisions of this Agreement ... respectively, shall govern."

The circuit court explained that "the release contained in the April 10, 2009 agreement between the parties further

supports the jury's unanimous verdict" and provided "additional grounds to deny South Causeway's motion for JNOV." [FSB]'s alleged failure to fund the interest reserve account with an additional $550,000 would have occurred prior to April 10, 2009. The agreement entered into ... broadly released [FSB] from any claim that arose prior to April 10, 2009. The release bars South Causeway's claim for breach of contract on this basis.

There is significant evidence in the record supporting the circuit court's denial of South Causeway's motion for JNOV, and the circuit court committed no error of law. *See Law*, 368 S.C. at 434–35, 629 S.E.2d at 645 (stating this court will reverse the circuit court's ruling on a directed verdict or JNOV motion only "when there is no evidence to support the ruling or where the ruling is controlled by an error of law"). Therefore, we affirm the circuit court's denial of South Causeway's motion for judgment notwithstanding the verdict.

 In its order denying South Causeway's motion for a new trial, the circuit court explained as follows:

South Causeway's reliance on the testimony of [Wheeler–Cribb in support of its motion] ... does not warrant invading the province of the jury as the finder of fact. ... There was conflicting testimony and evidence on the issues presented. The jury was free to find that ... Wheeler–Cribb was not credible and to not accept all or part of her testimony. Resolving disputes over the conflicting versions of the facts and the correct inferences to draw from those facts falls squarely within the jury's role as finder of fact. Therefore, the verdict is justified and this Court denies South Causeway's [m]otion for a new trial. ...

"South Carolina's thirteenth juror doctrine allows the circuit court judge to grant a new trial absolute when the judge finds the evidence does not justify the verdict." *Trivelas v. S.C. Dep't of Transp.*, 357 S.C. 545, 551, 593 S.E.2d 504, 507 (Ct.App.2004). "The effect is the same as if the jury failed to reach a verdict, and thus, the circuit court is not required to give any reason for granting the new trial." *Id.* at 553, 593 S.E.2d at 508. Assuming evidence exists to support the circuit court's decision, a "judge ... [, sitting as] the thirteenth juror, possess[es] the veto power to the Nth degree. ..." *Id.* (alterations in original) (quoting *Worrell v. S.C.*

*Power Co.,* 186 S.C. 306, 195 S.E. 638, 641 (1938)). Therefore, a circuit court's order granting or denying a new trial upon the facts will not be disturbed unless its decision is "wholly unsupported by the evidence or the conclusions reached are controlled by [an] error of law." *Cody P. v. Bank of Am., N.A.,* 395 S.C. 611, 623, 720 S.E.2d 473, 479–80 (Ct.App.2011) (alterations in original) (quoting *Vinson v. Hartley,* 324 S.C. 389, 405, 477 S.E.2d 715, 723 (Ct.App.1996)). Our review is limited to consideration of whether evidence exists to support the circuit court's order. *Lane v. Gilbert Constr. Co., Ltd.,* 383 S.C. 590, 597, 681 S.E.2d 879, 883 (2009).

As significant evidence supports the circuit court's denial of South Causeway's "thirteenth juror" motion, we affirm.

## CONCLUSION

We find the circuit court properly granted FSB's motion for a directed verdict on South Causeway's counterclaim for tortious interference with a prospective contract. The circuit court did not err in refusing to admit certain email correspondence because the correspondence was hearsay. Finally, the circuit court committed no error in denying South Causeway's motion for JNOV, or in the alternative, a new trial on the breach of contract counterclaim. Accordingly, the ruling of the circuit court is

**AFFIRMED.**

WILLIAMS and GEATHERS, JJ., concur.